636 F.2d 689
 204 U.S.App.D.C. 417
 ELECTRONIC INDUSTRIES ASSOCIATION CONSUMER ELECTRONICS
GROUP, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Council for UHF Broadcasting, Spanish International
Communications Corp., Field Communications
Corporation, Intervenors.
 No. 79-1197.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 13, 1980.
Decided Sept. 17, 1980.
Rehearing Denied Nov. 17, 1980.
 
 Petition for Review of an Order of the Federal Communications commission.
 William K. Black, Washington, D. C., with whom J. Edward Day and Charles M. Carron, Washington, D. C., were on the brief, for petitioner.
 Gregory M. Christopher, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., and John J. Powers, III, and Margaret G. Halpern, Attys., U. S. Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 Peter Tannenwald, Washington, D. C., with whom Cynthia L. Hathaway, Washington, D. C., was on the brief, for intervenor Council for UHF Broadcasting. Harry M. Plotkin and Theodore D. Frank, Washington, D. C., also entered appearances for intervenor Council for UHF Broadcasting.
 James A. McKenna, Jr. and Norman P. Leventhal, Washington, D. C., were on the brief for intervenor Spanish International Communications Corp.
 Lee M. Mitchell and Dennis W. Townley, Washington, D. C., were on the brief for intervenor Field Communications Corp.
 Before TAMM, ROBB and WALD, Circuit Judges.
 Opinion for the court filed by Circuit Judge TAMM.
 Dissenting Opinion filed by Circuit Judge WALD.
 TAMM, Circuit Judge:
 
 
 1
 Our technological capability is both boon and bane: it causes many of the social and environmental ills that now plague us, but we must depend with increasing frequency upon that same technology to solve these ever mounting problems. In this case, we explore the statutory limits on the use of regulatory power to induce a solution to an electronic problem involving that technological marvel of our age, television. The Federal Communications Commission (FCC or Commission) seeks to improve the reception of ultrahigh-frequency television signals by requiring television receiver manufacturers to improve the tuner noise performance of television sets. The Electronic Industries Association Consumer Electronics Group (EIA/CEG) challenges the order, claiming the Commission overstepped its authority under the All-Channel Receiver Act, Pub.L. No. 87-529, 76 Stat. 150 (1962). We agree that the Commission exceeded its authority under the Act by setting a television tuner noise standard that is not presently attainable with existing technology, and we therefore vacate that part of the Commission's order on appeal.
 
 I.
 
 2
 Television stations broadcast either on the Very High frequencies (VHF) (54 to 88 MHz (megahertz) and 174 to 216 MHz) or on the Ultrahigh frequencies (UHF) (470 to 812 MHz). Each television station, assigned by the Commission to a certain frequency on one of these bands, emits radio signals that can be picked up by television receivers in the area. The receiver converts the signal into electrical pulses that are broadcast on a phosphor-coated screen by means of an electron gun. Audio portions of the signal are also received and broadcast simultaneously with the picture.
 
 
 3
 The tuner receives and amplifies the signal from the set's antenna. In so doing, the tuner must reject the competing signals of other television stations and transmitters. This ability to reject competing signals (cross-modulation and intermodulation) is a tuner's selectivity. Any remaining interference, called noise or "snow," clouds the television picture, decreasing the quality of the reception. Some of this noise or "snow" is added by the tuner circuits themselves, as a by-product of their operation. A tuner's "noise figure," the amount of interference contributed by the tuner circuits, is measured in decibels.[1] A UHF tuner presents electronic design problems not shared by its VHF counterpart; consequently, the average noise figure for UHF tuners runs from 14 to 18 dB while VHF tuners are able to reach 6 to 8 dB.
 
 
 4
 In many respects, UHF has always been the ugly stepsister of television broadcasting. VHF flourished and UHF foundered in the 1950's due to VHF's stronger signal and the lack of receivers capable of picking up UHF signals. Despite these problems, the UHF spectrum remains the greatest hope for expanding the availability of television programming and channels; almost all of the remaining unassigned television channels are on the UHF band, and many of these channels are reserved by the Commission for educational and alternative programming.
 
 
 5
 The Commission, realizing the unfulfilled potential of UHF, has attempted to promote use of the UHF spectrum.[2] In 1962, Congress aided the Commission by passing the All-Channel Receiver Act, Pub.L. No. 87-529, 76 Stat. 150 (1962), to allow the Commission to require that all television receivers "be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting." 47 U.S.C. § 303(s) (1976).[3] Recognizing the importance of tuner performance in reducing noise, the Commission, pursuant to its new authority, promulgated a rule that required television receiver manufacturers to produce a tuner with a noise figure of 18 dB or better. 47 C.F.R. § 15.67(a) (1977) (superseded by present regulation in 1978).
 
 
 6
 In August of 1975, the Council for UHF Broadcasting (CUB) petitioned the Commission to amend the tuner noise regulation. It contended that technological advances made a lower tuner noise level possible and asked the Commission to adopt a tuner noise figure of 14 dB within six months, 12 dB within eighteen months, and 10 dB within thirty months. CUB Petition for Rulemaking at 6, reprinted in Joint Appendix (J.A.) at 57. It presented technical data to support its position and pointed to the lower noise figures of European tuners to demonstrate the feasibility of its request; domestic manufacturers, CUB believed, lagged behind their European counterparts because American receiver manufacturers concentrated on price competition rather than on UHF tuner performance.[4]
 
 
 7
 The Commission instituted rulemaking proceedings in 1976. See 41 Fed.Reg. 56210 (1976) (notice of inquiry and proposed rulemaking). It received technical papers[5] describing the feasibility of improving UHF tuner noise performance and commissioned Texas Instruments, Inc., to study the question and devise a receiver offering the best possible reception. The Commission also conducted a panel featuring broadcasters, technicians, manufacturers, and engineers to hear their testimony on the subject.
 
 
 8
 The Commission issued its report and order in August 1978. It adopted a maximum noise figure of 14 dB for all new television models beginning production after October 1, 1979.[6] UHF Television Receiver Noise Figures, 69 F.C.C.2d 1866, 1867 (1978) (report and order). Giving manufacturers three years to comply fully, the FCC ordered that all sets manufactured after October 1, 1981 would have to meet the 14 dB standard.[7] A maximum noise figure less than 14 dB, according to the Commission, "would not be in the public interest" at the present time. Id. at 1876. Nevertheless, the Commission decided that "further reductions in the noise figure beyond 14 dB are important and most likely obtainable without reducing receiver selectivity or abandoning electronic tuners." Id. Expressing faith that "the technical advances generated by this and other related Commission actions" would make it possible for future television sets to have a lower reasonable worst case noise figure, the Commission ordered a 12 dB limit for all new design models manufactured after October 1, 1982, with all new sets meeting that standard by October 1, 1984. Id. at 1880. One of two factors considered in determining the 12 dB deadline was "the need for significant technical improvements to reach 12 dB." Id. The Commission conceded that the technology necessary to achieve the 12 dB standard might not be developed as rapidly as expected, forcing changes in the established timetable:
 
 
 9
 Since this action is essentially based on our forecast of future technical developments, the staff will continue to conduct studies relating to the time table for noise figure reduction. While we now have no reason to question this forecast on which a reduction to 12 dB has been based, we might conclude modification of the time table would be appropriate in light of further information coming to our attention in this Docket.
 
 
 10
 Id. at 1876.[8] The Commission warned, however, that this new information might also establish the feasibility of imposing an even lower maximum noise figure standard. Id.
 
 
 11
 Two commissioners dissented on the 12 dB issue. Commissioner Robert E. Lee believed the 12 dB standard to be unattainable. "During all the years I have advocated UHF parity, I have learned that wishful thinking does not make it happen. I am dissenting here because I think the 12 dB standard represents more wishful thinking." Id. at 1885. (Lee, Comm'r, dissenting). Commissioner Margita E. White agreed: "(B)ased on the lack of evidence in the record supporting a 12 dB noise figure and the potential for inhibiting total improvement of UHF reception, I dissent to this part of the Commission's decision." Id. at 1886 (White, Comm'r, dissenting). The Commission denied EIA/CEG's petition for rehearing. UHF Television Receiver Noise Figures, 70 F.C.C.2d 1176 (1978) (memorandum, opinion, and order). Petitioners seek review in this court of the Commission's order lowering the tuner standard to 12 dB in 1981.[9]
 
 II.
 
 12
 EIA/CEG contends that the Commission, in promulgating the contested order, exceeded its legislative mandate under 47 U.S.C. § 303(s) (1976). It argues that Congress in the All-Channel Receivers Act, Pub.L.No.87-529, 76 Stat. 150 (1962), gave the Commission only limited authority to ensure that television receivers have adequate UHF signal reception. Such a mandate, EIA/CEG claims, does not authorize the Commission to set advanced UHF tuner noise standards that go beyond the present state of the art. The Commission, on the other hand, believes the Act does authorize regulations such as 47 C.F.R. § 15.66 (1979) that will make the reception of UHF and VHF signals comparable.
 
 
 13
 Having examined the legislative history and the purposes of the Act, we believe it grants the Commission considerable power to further the goal of UHF/VHF comparability. Congress also restricted this authority, however, for it did not want the Commission establishing performance standards for television. We hold that the Commission may, pursuant to the Act, set standards for UHF tuner noise that reflect current electronic capability. It may not, however, establish standards for the future that are not currently attainable with existing technology.[10]
 
 A. THE ACT AND ITS LEGISLATIVE HISTORY
 
 14
 During the first decade of television, most television receivers received only VHF signals. Consequently, the VHF band became saturated with stations and much of the UHF band remained unused.[11] Attempting to remedy this problem, Congress passed the All-Channel Receivers Act "to authorize the Federal Communications Commission to require that all television receivers ... at the time of manufacture ... be capable of adequately receiving all television channels." S.Rep.No.1526, 87th Cong., 2d Sess. 1 (1962) (hereinafter cited as Senate Report) U.S.Code Cong. & Admin.News, 1962, p. 1873.
 
 
 15
 The original version of the Act, H.R.8031, would have given the Commission the authority to set "minimum performance standards" for all television receivers shipped in interstate commerce. Senate Report 7. During hearings on the bill, however, this provision received considerable criticism as allowing the Commission too great of an involvement in questions of receiver design. In testifying on the bill, one congressman stated:
 
 
 16
 (The bill) should provide( ) that the FCC may not exercise any regulatory power over the manufacture of television receivers beyond that which is absolutely necessary to assure that the set can receive (all channels). The FCC should not have the power to require that all sets be color sets, or have a certain size of picture tube or be made with a certain size speaker and so forth.
 
 
 17
 All-Channel Television Receivers: Hearings on S.2109 Before the Subcomm. on Communications of the Senate Comm. on Commerce, 87th Cong., 2d Sess. 59 (1962) (testimony of Rep. Kenneth A. Roberts) (hereinafter cited as Senate Hearings ). An industry official commented: "We feel that H.R.8031 as presently worded, provides too broad an authority to prescribe 'minimum performance capabilities.... ' This could open the door to regulation of the design of television receivers extending far beyond the objective of all-channel tuners on all TV receivers ...." All Channel Television Receivers and Deintermixture: Hearings on H.R.8031 Before the House Comm. on Interstate and Foreign Commerce, 87th Cong., 2d Sess. 274 (1962) (testimony of W. Walter Watts, RCA Corp.).
 
 
 18
 The House Committee on Interstate and Foreign Commerce dropped the language allowing the Commission to set "minimum performance standards." In its place the Committee substituted a version empowering the Commission to require that television sets "be capable of receiving all frequencies allocated by the Commission to television broadcasting." H.R. Rep.No. 1559, 87th Cong., 2d Sess. 1 (1962) (hereinafter cited as House Report). The committee intended that
 
 
 19
 all receivers ... be constructed with equipment inside its cabinet which will have performance characteristics sufficient to permit satisfactory and usable reception of each of the present 12 VHF and 70 UHF channels in any location where, in the light of the normal state of receiver development at the time, such reception can be expected. The performance capabilities of such sets for receiving UHF signals should be adequate to assure that the purchasers of these sets will in fact get comparable reception from UHF and VHF stations.
 
 
 20
 Id. at 5 (emphasis added).
 
 
 21
 In this form the bill passed the House. During the Senate Commerce Committee's consideration of the bill, Newton Minnow, chairman of the Commission, wrote Senator John O. Pastore, chairman of the Subcommittee on Communications, expressing his concern that the House bill might be insufficient to ensure compliance by receiver manufacturers: "(A)s the legislation is presently drafted, we may be powerless to prevent the shipment ... of all-channel sets having only the barest capability for receiving UHF signals, and which therefore would not permit satisfactory and usable reception of such signals in a great many instances." Letter from Newton Minnow to Senator John Pastore (May 11, 1962) (hereinafter cited as Minnow Letter), reprinted in Senate Report, App. C, at 20, U.S.Code Cong. & Admin.News 1962, p. 1890. Chairman Minnow therefore requested a broader grant of authority. In so doing, he stated that the Commission would implement the legislation by issuing regulations concerning only two receiver characteristics, noise and selectivity. He further promised that
 
 
 22
 (i)n specifying these two characteristics, the Commission would seek to insure adequate or effective capability of all-channel reception-and not the best possible capability. It would avoid extreme or unreasonable performance specifications, but rather, would select standards which are in the realm of the average characteristics of UHF receivers available on the open market today.
 
 
 23
 Id. at 3 (original emphasis), reprinted in Senate Report, App. C, at 22, U.S.Code Cong. & Admin.News 1962, p. 1892. He made clear that the Commission sought "only the most limited authority needed to accomplish the statutory goal." Id., reprinted in Senate Report, App. C, at 20, U.S.Code Cong. & Admin.News 1962, p. 1891.
 
 
 24
 Based on these representations by the Commission, the Senate subcommittee amended the House bill to allow the Commission to require that television receivers "be capable of adequately receiving all frequencies" allocated to television broadcasting. Senate Report 8, U.S.Code Cong. & Admin.News 1962, p. 1880 (emphasis added). The committee, seeking to allay the fears of members who opposed the original broad grant of power to the Commission, emphasized the Commission's guarantees that receiver design regulation would be limited:
 
 
 25
 The FCC has assured us that the practical need for procuring authority which would permit effective enforcement of this legislation would not involve the Commission broadly in the dealings of television set manufacturers. On the contrary, the Commission's authority, restrictive as it would be of section 303(s), would be most limited and narrow. On the basis of these representations, your committee agrees that the authority given to the Commission to require that all channel receivers "be capable of adequately receiving" UHF channels is narrow in scope and in the main consistent with what the House did in reporting its legislation.
 
 
 26
 Id. In this form, the bill became law.
 
 
 27
 We accord the Commission broad discretion in implementing its controlling statutes. See Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1972). Such deference is especially appropriate in this instance because of the scientific nature of the questions involved, questions which call for the technical expertise of an agency and not the more general background of a lay judiciary. FPC v. Florida Power & Light, 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972); Public Citizen v. Foreman, 631 F.Supp. 969, at 975, (D.C.Cir. 1980). Nonetheless, when called upon to review the Commission's actions, we must apply our legal expertise at discerning the limits of the authority that Congress granted the Commission under the All-Channel Receivers Act. See FPC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965).
 
 
 28
 The Act's legislative history clearly indicates that Congress wanted to improve UHF service to make that band competitive with VHF. Congress left to the Commission the task of achieving this goal. The Commission decided that regulation of noise tuner standards and selectivity standards was the best means of improving reception.
 
 
 29
 Congress envisioned that technological developments would permit improvements in UHF reception. The House Report stated that the Act would require all receivers to have "satisfactory and usable reception of each of the present 12 VHF and 70 UHF channels in any location where, in the light of the normal state of receiver development at the time, such reception can be expected." House Report 5 (emphasis added). These improvements would further the goal of UHF/VHF comparability and expand the areas served by UHF broadcasters. Congress thus envisioned that the Commission's regulations would take these technical developments into account. As the state of the art advanced, the Commission could set more stringent standards for television receivers. In so doing, it would bring the goal of comparability closer to fruition.
 
 
 30
 Congress did not, however, give the Commission unbridled authority to reach its goal of comparability. Congress specifically rejected a broad grant of power when it deleted the provision allowing the Commission to set "minimum performance standards." Instead, Congress carefully limited the Commission's authority to ensuring that sets "be capable of adequately receiving" all television frequencies. Furthermore, Congress accepted this language only after the Commission stated that it would "seek to insure adequate or effective capability of all-channel reception-and not the best possible capability. It would avoid extreme or unreasonable performance specifications, but rather would select standards which are in the realm of the average characteristics of UHF receivers available on the open market today." Minnow Letter at 3 (original emphasis), reprinted in Senate Report, App. C, at 22, U.S.Code Cong. & Admin.News 1962, p. 1892.
 
 
 31
 This legislative history, clearer than most, indicates that the Commission could take into account technological advances in setting regulations for UHF tuner noise. Congress, however, also limited the Commission's power. Given these limitations, the Commission may not prescribe noise regulations that go beyond the present state of the art.[12] The Commission, by taking such action, would overstep its authority and violate its pledges to Congress that served as the basis for the congressional grant of authority.
 
 B. THE COMMISSION'S DECISION
 
 32
 Given this legislative history, we must examine the record to determine whether the Commission acted within its statutory mandate.[13] If the record indicates that technology now exists to support a 12 dB tuner noise standard, then the Commission lawfully furthers the goal of UHF/VHF comparability in promulgating the regulation. If such evidence does not exist, the regulation is invalid.
 
 1. The Commission's Order
 
 33
 We begin, as we must, with the Commission's order, UHF Television Receiver Noise Figures, 69 F.C.C.2d 1867 (1978) (report and order). The Commission in its order indicated that present receivers could not reach the 12 dB standard; in fact, the present technology barely satisfied the 14 dB standard the Commission imposed: "a reasonable 14 dB worst case level of performance is being obtained today only by using some of the best components available.... (I)t is clear that lowering the maximum noise figure below 14 dB without reducing selectivity will require significant new engineering work." Id. at 1877. The Commission believed its order would stimulate the receiver industry to conduct the research needed to improve the tuners. After concluding that "further reductions in the noise figure beyond 14 dB are important and most likely obtainable without reducing receiver selectivity or abandoning electronic tuners," the Commission expressed its belief "that the technical advances generated by this and other related Commission actions will make this possible." Id. at 1876. These admissions that further work would be required to meet the 12 dB standard seriously undercut any argument that the standard is presently attainable.
 
 
 34
 In justifying its denial of EIA/CEG's petition for reconsideration, the Commission recognized but rejected the contention that the 12 dB tuner noise level was not technologically feasible at present:
 
 
 35
 Fundamental to each of EIA/CEG's arguments against the 12 dB limit is the fact that the Commission is expecting a level of television receiver performance that has not been demonstrated to date. Current receiver models do not combine a lower noise figure with no increase in interference susceptibilities at a reasonable cost in a production line environment. We were, of course, aware of this fact when we made our original decision in this proceeding.
 
 
 36
 UHF Television Receiver Noise Figures, 70 F.C.C.2d 1176, 1180-81 (1978) (memorandum, opinion, and order) (emphasis added).[14] Having so stated, the Commission then "identified (two) specific areas where technical improvements were possible." Id. at 1181.[15] Nevertheless, even with these improvements, the Commission had to admit that it could not "say that either or both are sufficient, by themselves, to allow manufacturers to achieve a 12 dB limit by 1982." Id. at 1182. Indeed, the Commission noted that these developments merely "supported (the Commission's) belief that there are technical improvements possible over the next four years which will make the 12 dB limit achievable." Id.
 
 2. The Rulemaking Record
 
 37
 Testimony and comments during the panel hearing and the Commission's public deliberations support this view that the 12 dB tuner standard is not presently feasible. During the rulemaking proceeding, Texas Instruments, Inc., claimed that a 10 dB tuner was feasible using existing components. At the hearing, however, Doctor Clinton Hartmann of Texas Instruments acknowledged that the 10 dB standard was not attainable; he in fact recommended establishing only the 14 dB figure because of his "uncertainty" over any lower standard.[16] Transcript of Panel Presentation at 47 (May 10, 1978), reprinted in J.A. at 587.
 
 
 38
 At a Commission meeting with its technical experts, these experts also expressed doubts about reducing the noise standards. Paul Fox, a Commission engineer, having reviewed the data submitted by the manufacturers, commented that "(e)ven with the best technology none of the individual categories of tuner technology meet an absolute 14 dB limit." Transcript of Open Commission Meeting at 3, reprinted in J.A. at 720. He cautioned the Commission to proceed slowly, noting "to get to 12 we're really going to have to pull some rabbits out of the hat." Id. at 41, reprinted in J.A. at 758. Ray Spence, the Commission's Chief Engineer, agreed: "I don't think we have the evidence in our record or supportable from the other work that we did at the laboratory, that we can go below 14 dB in any given time period without jeopardizing the existing taboos or jeopardizing more likely our ability to reduce those taboos from a spectrum consideration." Id. at 51, reprinted in J.A. at 768.[17]
 
 
 39
 Commissioners at the open meeting expressed that their desire to further the public interest by lowering the tuner noise standard to 12 dB would be achieved in spite of, rather than in light of, current technological limits. They acknowledged that the evidence on the 12 dB standard was mixed at best but believed the Commission had to prod the industry. As Commissioner Washburn stated, "I certainly don't buy your statement that we can't consider 12 or 10. We can consider it, and we should as leaders sitting here set some sights, and I agree ... that we can raise the sights of the industry and we should." Id. at 43, reprinted in J.A. at 760.
 
 
 40
 The Commissioners found the evidence on the 12 dB standard to be conflicting. Despite warnings from their experts on the standard's attainability, they adopted the 12 dB level to promote UHF programming. Chairman Ferris summarized the Commission's position well: "we're talking really about elements of faith rather than fact, and its (sic) awfully hard to measure faith." Id. at 52, reprinted in J.A. at 769.
 
 
 41
 This faith is not enough. Given the evidence in the record, we must conclude, as has the Commission in its report and order, that the 12 dB standard is not attainable at present. While we are sympathetic to the Commission's goal of UHF/VHF comparability, both we and the Commission must obey the mandate of Congress. That mandate does not authorize the Commission to go beyond assuring "adequate" UHF reception. The Commission's faith in technological improvement is no substitute for present engineering capability. The Commission's order must be vacated.
 
 III. CONCLUSION
 
 42
 The poet Robert Browning once wrote that man's "reach must exceed his grasp,/ Or what's a heaven for." Today's technology extends our reach tremendously, but our present knowledge limits our grasp. The solution to the UHF tuner noise problem presently lies beyond our grasp, and the technological breakthrough needed to solve this problem may occur soon, or not at all. Unless Congress revamps the FCC's authority, the Commission may urge the receiver industry to work on this problem, but it may not reach beyond our present capabilities to compel a solution by rulemaking. The Commission's rule with respect to the 12 dB standard is hereby
 
 
 43
 Vacated.
 
 WALD, Circuit Judge, dissenting:
 
 44
 The majority conclude that the Federal Communications Commission (FCC or Commission) had no authority under the All-Channel Receiver Act (the Act), 47 U.S.C. § 303(s) (1976), to impose a 12 decibel noise level standard for ultra-high frequency (UHF) tuners, effective October 1, 1982 for new television models and October 1, 1984 for all other television sets. Because I think the authority conferred by the Act is broad enough to encompass the setting of the standard here challenged and because I think the Commission's authority in this respect was not exercised unreasonably, I would affirm the Commission's rule.
 
 
 45
 No one would deny that in setting this standard the Commission has undertaken, on a small scale, to prod technological development of television receiver design. Although the twelve decibel level can be and has been achieved by some sets manufactured both here and abroad,[1] further engineering work is necessary to develop models which can universally meet the standard, given (a) the present range in quality of theoretically identical sets and (b) the present tradeoffs in interference susceptibility[2] which uniform noise level improvement may require.
 
 
 46
 The Commission has stated its belief that a substantial portion of the improvement required by the rule is attainable with existing technology[3] but has also acknowledged that there must be "significant new engineering work"[4] to meet the 12 decibel standard as a "worst case" rule,[5] without reducing signal selectivity to unacceptable levels.[6] The needed improvements, the Commission maintains, represent only a reasonable "forecast of future technical developments,"[7] and a standard based on such a forecast, it argues, is permissible under the Act.[8] The Commission finds such technology-nudging appropriate because in the sixteen years since the 18 decibel standard was set, "there has not been a(n) ... improvement in overall noise figures" corresponding to "the significant improvements that have occurred in electronic technology,"[9] and because, in the Commission's judgment, improved reception will contribute substantially to expansion of UHF stations and programming,[10] a major objective of the Act.[11]
 
 
 47
 The majority, while sympathetic to the Commission's goals, decide that the Act simply does not permit the Commission to impose this standard, apparently because standard-meeting sets with acceptably low interference susceptibility have not already been developed and produced at a reasonable cost.[12] The obvious result of such an interpretation is to leave improvement entirely to the industry's discretion. The Commission is thus relegated to the role of following the industry's Sisyphus up the hill, setting up barriers against slippage but being able only to watch and wait should the industry decide to take a prolonged nap on the hillside.
 
 
 48
 My own reading of the Act and its legislative history is not so limited. The Act provides that the Commission shall "have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting ...." 47 U.S.C. § 303(s) (emphasis supplied). The key word of course is "adequately" and its definition and implementation is left to the Commission.
 
 
 49
 The majority correctly point out that when the Act was being considered by Congress, proposals to authorize the Commission to prescribe "minimum (receiver) performance standards" were criticized as "too broad." Fear was expressed that this language "would give the FCC authority to prescribe any and all performance characteristics of television receivers." Sen.Rep. No. 1526, 87th Cong., 2d Sess. 7 (1962) (hereinafter cited as Senate Report) (referring to hearings before the Committee), U.S.Code Cong. & Admin.News 1962, p. 1879.[13] The House Committee, which was the first to act in the wake of these criticisms, deleted the minimum performance standard provision and substituted language authorizing the Commission only to require that sets "be capable of receiving" all television channels. H.Rep. No. 1559, 87th Cong., 2d Sess. 5 (1962) (hereinafter cited as House Report) (emphasis supplied). The report explaining the change emphasized, however, that minimal capability was not what the Committee had in mind. The substituted language was instead expected to result in a rule that
 
 
 50
 all receivers ... will be constructed with equipment inside its cabinet which will have performance characteristics sufficient to permit satisfactory and usable reception of each of the present 12 VHF and 70 UHF channels in any location where, in the light of the normal state of receiver development at the time, such reception can be expected. The performance capabilities of such sets for receiving UHF signals should be adequate to assure that the purchasers of these sets will in fact get comparable reception from UHF and VHF stations.
 
 
 51
 Id. (emphasis supplied). The majority bear down on the phrase "in the light of the normal state of receiver development at the time"; I would command equal attention to another emphasized portion of the quoted excerpt: that which contemplates the prescription of standards "adequate to assure ... purchasers ... (that they) will in fact get comparable reception from UHF and VHF stations." It is clear that effective, not token, UHF reception was intended. Again, explaining the substituted language, the House Report stated:
 
 
 52
 The Committee desires to make it very clear ... that by "all channel television sets" we mean television receiving sets capable of effectively receiving all channels. Any set which is not capable of performing as contemplated by this legislation and this report should be regarded as being a fraud on the public.
 
 
 53
 Id. at 6 (emphasis supplied).
 
 
 54
 My reading of the standard developed by the House authorizes the Commission to prescribe standards necessary (a) for effective reception and (b) for comparability between UHF and VHF stations, as long as the prescribed standard was achievable, "in the light of the normal state of receiver development" at the time. As to this latter phrase, I see no reason to read into it an absolute prohibition against standards which would require the development and production of better receivers, if this development and production can be accomplished with reasonable effort given the present state of the art.
 
 
 55
 As the majority note, when the House bill was transmitted to the Senate it was amended again to insert the word "adequately" in the "capable of receiving" standard approved by the House. FCC Chairman Newton Minow had warned the Senate Commerce Committee considering the bill that mere "capability" might not be construed as broadly as the House Committee had intended, Letter from Newton N. Minow, Chairman, FCC, to Senator John O. Pastore (May 11, 1972), reprinted in Senate Report at 20, 20-21, and urged, therefore, that "the legislation ... be explicit on this important policy aspect...." Id. at 21, U.S.Code Cong. & Admin. News 1962, p. 1891. He stressed in his letter that market forces could not be relied upon to insure the "effective capability" which he thought necessary to the purposes of the Act:
 
 
 56
 (T)he (House) report recognizes the importance of this matter of effective capability as against capability so inferior as to frustrate the legislative objective, but seeks to deal with it in the legislative history rather than the statute. If all the manufacturers heed this admonition in the report, there will, of course, be no problem. But, if all do not, the Commission will have no authority to remedy the situation.
 
 
 57
 ... (W)e think it important, as a matter of policy, that the Commission not be left powerless to deal with such a situation. We do not say that the situation will develop or is likely to develop. But we cannot say that it is not a possibility in view of the initial competitive factors. If, from the very beginning, there were a heavy demand for UHF receivers, competition could be relied upon to insure adequate performance by the UHF portion of all-channel receivers. But, particularly during the initial period when such demand may be lacking, competitive factors may have the opposite effect. In such circumstances, it is not inconceivable that a few manufacturers may skirt as closely as possible to a mere token UHF receiver component in order to gain a price advantage over their more conscientious rivals. This would hurt not only these rivals but the very important public interest objective of the legislation.
 
 
 58
 Id. Clearly the ultimate objective was some semblance of comparability between UHF and VHF; accordingly, Commissioner Minow stated:
 
 
 59
 It is the Commission's judgment that effective implementation of the all-channel legislation will necessitate authority for the Commission to specify two receiver characteristics. These two characteristics, which we believe are essential to truly insure the "capability" required by this legislation, are: (1) receiver noise figure at UHF relative to that at VHF; and (2) receiver sensitivity at UHF relative to that at VHF. It is, we think, insufficient to specify merely that the receiver be capable of receiving or "tuning in" all channels, without specifying these characteristics. For in the absence of such specifications, receivers could be legally shipped which while capable of being "tuned " to a UHF channel and thus of receiving it, would require an inordinately strong UHF signal to produce satisfactory picture or sound. Such near-token capability of all-channel reception would obviously be ineffective in achieving the objectives of the legislation.
 
 
 60
 Id. (footnotes omitted).
 
 
 61
 Heeding the House Committee's admonition which the Commissioner feared would fall on deaf industry ears, the Senate Committee added "adequately" to the all-channels capability requirement approved by the House. The Commission's concern about comparability of receiver capability was emphasized in the Committee's explanation of the amendment:
 
 
 62
 The Federal Communications Commission in a letter dated May 11, 1962 ... expressed deep concern to your committee that the legislation as amended could be construed as being too limited and would make the Commission powerless to prohibit the shipment in interstate commerce of all-channel television sets having the barest capability of receiving signals which therefore could not permit satisfactory and usable reception of such signals in a great many instances.
 
 
 63
 According to the FCC it was not clear how far the Commission could proceed in promulgating rules regarding the performance characteristics sufficient to permit satisfactory and usable reception of each of the present 12 VHF and 70 UHF channels. Or to what extent, if any, enforceable rules could be promulgated concerning the performance capabilities for all-channel television sets that would assure the purchasers of these sets that they were in fact getting comparable signals from UHF and VHF stations.
 
 
 64
 Id. at 8, U.S. Code Cong. & Admin. News 1962, p. 1880. The amendment proposed by the Committee was approved by the Senate and acceded to by the House resulting in the language of the present Act.
 
 
 65
 The need to vitalize UHF broadcasting which motivated both the Act and the Senate Committee's amendment was quite recently reemphasized by Congress. In 1978, just before the Commission announced its new noise standards, the Senate added $750,000 to an appropriations bill for the express purpose of achieving parity between UHF and VHF broadcasting. The reason for this addition, agreed to by House conferees, see H.R.Rep.No.1565, 95th Cong., 2d Sess. 23 (1978), was explained by the Senate Appropriations Committee:
 
 
 66
 The Committee has ... added $750,000 ... to the House allowance (for the Federal Communications Commission) because it finds that the intent of the All Channel Receiver Act of 1962 has not been realized. UHF television broadcasting remains sorely disadvantaged within the national television system. The Committee directs that the Commission devise a plan for UHF to reach comparability with VHF in as short a time as practicable, and that the Commission devote the necessary resources to drafting such a plan in fiscal year 1978 until these additional resources become available in fiscal year 1979.
 
 
 67
 This plan should address all the technical and regulatory aspects of achieving parity and should set a schedule for dealing with each including dates for achieving specific goals, such as noise-level reductions. It should also include indications of the probable need for any legislation necessary to fulfill the plan. The Commission should submit the plan to the Committee by December 31, 1978 ....
 
 
 68
 S.Rep.No.1043, 95th Cong., 2d Sess. 71-72 (1978) (emphasis supplied). This important piece of legislative action should certainly not be overlooked in our search for interpretive guidance in construing the Act's crucial and preeminently ambiguous term: "adequately." Of course, " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,' "[14] but the 1978 appropriations and their express purpose do more than simply imply intent with respect to the 1962 Act, they also constitute a clear directive to the Commission. The Act should be read consistently with this directive if it is possible to do so without either straining its language or overriding plain and specific Congressional intent. In my view it is possible to do so in this case.
 
 
 69
 It is true that Commissioner Minow told the Senate Committee considering the Act that the FCC
 
 
 70
 would avoid extreme or unreasonable performance specifications, but rather, would select standards which are in the realm of the average characteristic of UHF receivers available on the open market today.
 
 
 71
 Id. at 22, U.S. Code Cong. & Admin. News 1962, p. 1892. To read this statement literally as an expression of Congressional intent would, however, require that standards be set according to receivers available on the market in 1962. Although relying heavily on this statement,[15] the majority reject this literal interpretation in favor of one that appears to limit the authorized standards to those derived from receivers available on the market at the time the standard is set. Because such a reading to my mind ignores (a) the important objective of comparability between UHF and VHF receivers which underlay the Committee's amendment, (b) the overriding concern to expand UHF access which motivated the Act, and (c) later expressions of Congressional purpose to achieve UHF parity,[16] I do not think such a reading is required by the Act; but even accepting the Minow statement as a limitation of the Commission's authority under the Act, I think the 12 decibel standard falls within the ambit of that authority.
 
 
 72
 It is undisputed that a certain number of American sets which roll off the production line currently meet the 12 decibel standard[17] and that some models produced by European manufacturers are capable of routinely meeting that standard.[18] In my view these facts establish that lower noise figures are within the "normal state of receiver development" and comport with "the average characteristics of ... receivers available on the open market." Thus even if the Commission's authority under the Act is limited by the quoted phrases, I think the Commission had authority to prescribe the 12 decibel standard; the only question is whether the Commission's authority was exercised reasonably, given the effort which may have to be made to produce sets at a reasonable cost and with interference susceptibility suitable to American broadcasting conditions.[19] To these latter assessments, however, the agency's expertise is committed in the administration of the Act and its judgments should not be set aside by this court unless arbitrary or capricious. See FPC v. Florida Power and Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972).
 
 
 73
 Various surveys, engineering studies, and model receiver results considered by the Commission in setting the standard suggests that the production of standard-meeting sets can be accomplished within the four years provided by the Commission for this purpose.[20] Moreover the Commission has stated its flexibility on the matter: if, after a reasonable period it appears that a lower noise figure cannot be achieved at a reasonable cost and without unacceptable tradeoffs, the Commission will reconsider its standard.[21] I am not convinced on this record that the 12 decibel standard, when added to the other demands placed on the industry, creates a burden so onerous or a dilemma so unreasonable that the standard must be set aside. The standard will serve, not frustrate, the important Congressional objective of comparability between UHF and VHF signal reception and the means employed by the Commission to achieve this end lack neither authority nor reason. I would therefore affirm the Commission's rule.
 
 
 
 [1]
 The Commission computes the noise figure by comparing the total noise (in watts) measured at the receiver's output with the portion of the total attributable to the thermal noise from a dummy antenna at a standard temperature (that is, the portion of the total not attributable to noise produced by the tuner circuits). See 47 C.F.R. § 15.4(h) (1979). The noise figure, in decibels, is equal to 10 times the logarithm to the base 10 of the ratio of total output noise to the output noise due to thermal noise. See generally Inst. of Electrical and Electronic Engineers, IEEE Standard Dictionary of Electrical and Electronic Terms 164 (2d ed. 1977). Thus, if the total output noise from a receiver is twice the output noise due to antenna thermal noise, the receiver would be said to have a 3 dB noise figure
 According to the Commission, reducing a receiver's noise figure by 4 dB would cause about one-third of the television viewers to feel that picture quality had improved from "unusable" to "inferior," to "marginal," "marginal" to "passable," "passable" to "fine," or "fine" to "excellent." This would be the same effect as if the UHF station had increased its radiated power by 2 times. The average television viewer would see this one-step improvement if the noise figure were reduced by 6 dB. UHF Television Receiver Noise Figures, 69 F.C.C.2d 1186, 1875 (1978) (report and order). A UHF station would have to quadruple its radiated power to match the 6 dB noise figure reduction.
 
 
 [2]
 These efforts included the ill-fated deintermixture policy of the late 1950's and early 1960's. The Commission originally intermixed VHF and UHF allocations in communities to offer the broadest number of channels for the area. This policy was largely unsuccessful because applicants for broadcasting licenses, advertisers, and viewers all preferred VHF to UHF due to the former's superior broadcast signal and the unavailability of receivers with UHF tuners. To remedy the problem, the Commission turned to deintermixture: in certain communities, all stations were required to switch to UHF frequencies to place them all on the same competitive footing
 The deintermixture policy had few supporters in Congress, and the problem of channel allocation received considerable congressional attention. See generally All-Channel Television Receivers: Hearings on S. 2109 Before the Subcomm. on Communications of the Senate Comm. on Commerce, 87th Cong., 2d Sess. (1962); E. Krasnow & E. Longley, The Politics of Broadcast Regulation 98-101 (1973). Congress passed the All-Channel Receiver Act in part to forestall further efforts at deintermixture. See S.Rep.No. 1526, 87th Cong., 2d Sess. 5-7 (1962), U.S.Code Cong. & Admin.News 1962, p. 1873.
 Other Commission initiatives at promoting UHF broadcasting have been more successful. UHF receivers must have detent (click-stop) tuners, which help eliminate interference from signals of adjacent channels and facilitate tuning by users. See All-Channel Television Broadcast Receivers, 21 F.C.C.2d 245 (1970) (report and order) (regulation codified at 47 C.F.R. § 15.68 (1979)). In addition, all receivers with a VHF antenna must also have a UHF antenna. See Television Broadcast Receiver Antenna, 62 F.C.C.2d 164 (1976) (report and order) (regulation codified at 47 C.F.R. § 15.65 (1979)).
 
 
 [3]
 This section states in full that the Commission shall
 (h)ave authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such appar(a)tus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.
 47 U.S.C. § 303(s) (1976).
 
 
 [4]
 The lower noise figures for European tuners are due in part to the broadhand input circuit they employ. American receivers use a selective tuned circuit that is needed for interference rejection. See EIA/CEG Opposition to CUB Petition at 7, reprinted in Joint Appendix (J.A.) at 195
 
 
 [5]
 See, e. g., Sillman and Wilner, Comparative UHF Cross Modulation Performance of Several 1976 Color Television Receivers (Aug. 20, 1976) (Engineering Report E 7607, Public Broadcasting Corp.), reprinted in J.A. at 247; Middle-Kamp, Davis & Weber, Relationship Between Noise Figures and Other Performance Characteristics of Contemporary UHF-TV Receivers (May 1978) (FCC Project 22489), reprinted in J.A. at 516
 
 
 [6]
 The Commission changed the standard slightly to require a "reasonable, rather than absolute worst set limit ...." UHF Television Receiver Noise Figures, 69 F.C.C.2d 1866, 1873 (1978) (report and order). Under the new regulation, "97 1/2% of all sets within a model (must) have maximum noise level figures (worst channel) at or below (the) limit." Id
 
 
 [7]
 The Commission included this provision because the television receiver industry has a three year redesign cycle for its television models. Id. at 1879
 
 
 [8]
 Commissioners made clear at an open meeting on the rule that they did not intend to grant waivers to the manufacturers:
 (W)hen we finally set the (12 dB standard) in marble, it's going to stay there. There aren't going to be any waivers. There is not going to be any hardship shown. You know, it's the idea that that's what the technology can do, that's the existing technology, and it's the idea that if you can't stay abreast with the state of the art you are just going to find something else to do.
 Transcript of Open Commission Meeting at 58 (statement of Chairman Ferris), reprinted in J.A. at 775.
 
 
 [9]
 EIA/CEG does not contest that part of the rule lowering the permissible tuner noise level to 14 dB
 
 
 [10]
 See note 12 infra
 
 
 [11]
 See pages 691-692 supra
 
 
 [12]
 By "present state of the art" we do not mean the ne plus ultra, the apex of present technical achievement. The Commission may impose a more rigorous noise maximum only if the new figure is commercially feasible in light of the Commission's other broadcasting or receiver standards. See also, e. g., notes 14 & 16 infra
 
 
 [13]
 Under the Administrative Procedure Act, we must set aside agency actions that are "in excess of statutory jurisdiction, authority or limitations." 5 U.S.C. § 706(2)(C) (1976)
 
 
 [14]
 In a footnote, the Commission acknowledged the crux of the problem:
 The present technological problem is the simultaneous achievement of all three of the needed properties-12 dB noise figure, no increase in interference susceptibility, and reasonable cost. Any two of the three properties can be obtained by sacrificing the third. For example, the lower noise figure can easily be obtained at a reasonable cost but at the expense of significant degradation to picture quality in many locations where current receivers deliver a high quality picture. We believe that technical developments will make the simultaneous achievement of all three properties possible.
 UHF Television Receiver Noise Figures, 70 F.C.C.2d 1176, 1180 n.18 (1978) (memorandum, opinion, and order).
 
 
 [15]
 These technical improvements were "improved connections from the back of the set to the tuner and lower noise figure transistors." UHF Television Receiver Noise Figures, 70 F.C.C.2d 1176, 1181 (1978) (memorandum, opinion, and order)
 
 
 [16]
 At the Commission hearing, Lawrence MiddleKamp of the Commission discussed the discrepancy between Texas Instruments's original representation about a 10 dB tuner and Dr. Hartmann's comments during the panel hearing
 The (Texas Instruments) figures you're quoting are projected noise figures that could be obtained on a completely theoretical basis. TI has never implemented an instrument that would give that type of noise figure.
 They have never even given us an instrument that would meet the 12 dB, and that would be just one queen bee model. We're talking here about production units. C.U.B., in the same context, has given the opinion that we can reach 10 dB. They have never implemented a device to allow us to measure to demonstrate that fact.
 I can go out and make an opinion even as an engineer. I can give you an 8 dB. I first have to prove it. I have to provide one, I have to have it tested and shown that it can in fact meet those requirements. Then I consider the vagaries that will go on in production, and our feeling is that no, Clint Hartman (sic) was quite accurate when he rescinded his original statement ....
 Transcript of Open Commission Meeting at 22-23, reprinted in J.A. at 739-40. Cf. Robinson, The Federal Communications Commission: An Essay on Regulatory Watchdogs, 64 Va.L.Rev. 169, 219 (1978) (submissions to the Commission are a "jumble of fact, surmise, anecdote, and argument").
 
 
 [17]
 Taboos are "restrictions on assignment of (UHF) channels having certain frequency relationships, within certain required geographical separations." Re-Evaluation and Revision of the UHF TV "Taboo" Table, 53 F.C.C.2d 411, 411 (1975) (notice of inquiry). See 47 C.F.R. § 73.698 (1979) (table IV) (table of "taboo" frequencies). The Commission established these "taboos" to compensate for UHF TV receiver susceptibility to interference from signals on one channel when tuned to signals on another. 53 F.C.C.2d at 411-12
 
 
 [1]
 See, e. g., L. Middlekamp, H. Davis & L. Weber (FCC Office of Chief Engineer, Laboratory Division), Relationship Between Noise Figures and Other Performance Characteristics of UHF TV Receivers, Fig. 2 (April 1978), Joint Appendix (J.A.) 516, 523 (reporting manufacturer certification data on noise figure); Comments of General Instrument Corporation at 4 (March 17, 1977), J.A. 479, 481 (tuners manufactured by GI "consistently ... measure no more than 12" decibels); File Memorandum from John H. McMahon, Chief of FCC Systems Engineering Branch, Office of the Chief Engineer (Jan. 6, 1977), J.A. 854 (one hundred sixty-nine of 621 television receivers examined showed maximum noise level of 12 decibels or less); Reply to Oppositions to Petition for Rulemaking, App. 2 (Nov. 24, 1975), J.A. 225, 243 (summarizing data from foreign tuners); Engineering Statement in Support of the CUB Petition for Rule Making to Lower the Noise Figure of UHF Television Receivers at 2 (Aug. 5, 1975), J.A. 63, 69 (abstracting Hazeltine Report measurements of noise figures of 10 domestic receivers and 8 foreign tuners); Hazeltine Research, Inc., Measurement and Survey Program of UHF Tuner Noise Figure at 9-10 (Nov. 15, 1974, as amended, June 27, 1975) (Report No. 3614), J.A. 98-99, as amended, J.A. 88 (reporting noise measurements of 10 domestic receivers and 8 foreign tuners)
 
 
 [2]
 The terms "signal selectivity" and "interference susceptibility" are used synonymously in this opinion. Both refer to a tuner's ability to reject signals broadcast on other (usually neighboring) frequencies. In this country the UHF band has been divided into 70 channels. The large number of channels and their consequent proximity one to another create the possibility of more difficult signal selectivity problems here than in countries where fewer UHF channels operate at more broadly spaced frequency intervals. The FCC has attempted to compensate for these difficulties by establishing the "taboos," referred to in the majority opinion at n.17
 
 
 [3]
 UHF Television Receiver Noise Figures, 70 F.C.C.2d 1176, 1181-82 (1978) J.A. 41, 48 (memorandum, opinion and order on reconsideration)
 
 
 [4]
 UHF Television Receiver Noise Figures, 69 F.C.C.2d 1866, 1877 (1978), J.A. 13, 26 (original report and order)
 
 
 [5]
 The actual quality of even uniformly-designed receivers varies significantly. The original 18 decibel standard was one required to be met by the poorest quality set produced. 47 C.F.R. § 15.67(a) (1977) (amended 1978). This insured, given the variation in quality of sets actually produced, that most sets operated at a better noise level than that prescribed. The "worst case" rule was revised by the FCC in the rulemaking proceeding now before us; the new rule requires that "97 1/2% of all sets within a model have maximum noise level figures (worst channel) at or below (the new) limits. 69 F.C.C.2d 1866, 1873 (1978), J.A. at 21. See majority opinion at n.6
 
 
 [6]
 At the time the rule here under review was adopted, the Commission had not expressly prescribed signal selectivity standards for receivers subject to the Act. See 69 F.C.C.2d at 1876, J.A. at 25. Although the Commission did express its hope that improved noise levels would not result in greater interference susceptibility, it did not then prohibit a reduction in signal selectivity nor did it specify what would constitute an unacceptable level of interference susceptibility. The Commission did indicate its intent to regulate in this area, id., and has subsequently issued a notice of inquiry concerning, inter alia, standards for interference susceptibility, 70 F.C.C.2d 1150 (1978), but to my knowledge has not yet set a standard governing this aspect of receiver quality. In the absence of previously-issued signal selectivity standards, it is difficult to conclude that the 12 decibel noise figure is unreasonable because it has not been shown to be achievable without "unacceptable" reductions in signal selectivity; it is even more difficult to conclude, as the majority do, that it is ultra vires. See majority opinion at note 12 and accompanying text; id. at note 14
 
 
 [7]
 69 F.C.C.2d at 1876, J.A. at 25
 
 
 [8]
 Brief for Respondents at 21-25
 
 
 [9]
 69 F.C.C.2d at 1878, J.A. at 27
 
 
 [10]
 69 F.C.C.2d at 1866-67, 1869-71, J.A. at 13-14, 16-19
 
 
 [11]
 S.Rep. No. 1526, 87th Cong., 2d Sess. 2-4, 7 (1962); H.R.Rep. No. 1559, 87th Cong., 2d Sess. 2-3, 4-5 (1962)
 
 
 [12]
 See majority opinion at notes 12-14 and accompanying text
 
 
 [13]
 As the majority note, the fear expressed was not that the FCC would prescribe standards to reduce noise or improve signal selectivity but that it could "require that all sets be color sets, or have a certain size of picture tube or be made with a certain size speaker." All-Channel Television Receivers: Hearings on S. 2109 Before the Subcomm. on Communications of the Senate Comm. on Commerce, 87th Cong., 2d Sess. 59 (1962), quoted in majority opinion at n.2. See also 108 Cong.Rec. 10544 (1962) (statement by Sen. Javits):
 (The bill) would allow the FCC to establish standards for television sets only to the limited extent necessary to assure that all sets are capable of adequately receiving all television channels. The FCC would not be authorized to get into such questions as picture tube size or whether all sets should be equipped for color.
 
 
 [14]
 CPSC v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 2060-61, 64 L.Ed.2d 766 (1980) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960))
 
 
 [15]
 Majority opinion at pp. 694-695, 696
 
 
 [16]
 See pp. 693, 694, supra
 
 
 [17]
 See note 1, supra
 
 
 [18]
 See note 1, supra
 
 
 [19]
 See note 6, supra
 
 
 [20]
 See, e. g., Transcript of Panel Presentation at 46 (May 10, 1978), J.A. 537, 586 (discussing Texas Instruments model); Comments of Texas Instruments Incorporated, (April 26, 27, 1977), J.A. 511-515 (discussing current technical developments); Atlantic Research Corporation, Engineering Statement Prepared for the Iowa State Educational Radio and Television Facility Board at 4 (Apr. 26, 1977), J.A. 487, 491-92 (suggesting means by which noise can be reduced); Comments of Kaiser Broadcasting Company at 3, Exh. A at 4 (Mar. 4, 1977), J.A. 457, 459, 469 (same)
 
 
 [21]
 69 F.C.C.2d at 1876, 1880, J.A. at 25, 29