COMMUNITY TELEVISION, INC., et al., Appellant/Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee/Respondent.

Paxson Communications Corporation, et al., Intervenors.

Association for Maximum Service Television, Inc., et al., Intervenor.

Nos. 98–1106, 98–1212, 98–1259 & 99–1082.

United States Court of Appeals, District of Columbia Circuit.

Argued March 27, 2000.

Decided July 7, 2000.

---

John Griffith Johnson, Jr. argued the cause for petitioners. With him on the briefs were Gene A. Bechtel, Christopher D. Imlay, Stephen T. Yelverton, Arthur H. Harding, R. Bruce Beckner, Jill Kleppe McClelland, and Daniel R. Ball. Richard F. Swift entered an appearance.

Scott D. Dailard argued the cause for intervenors Paxson Communications Corporation, et. al. With him on the briefs were John R. Feore, Jr., Barry A. Friedman and David M. Silverman.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Joel Marcus and K. Michele Walters, Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Adam D. Hirsh, Attorneys. Catherine G. O'Sullivan, and Christopher J. Sprigman, Attorneys, U.S. Department of Justice, entered appearances.

Jonathan D. Blake was on the brief for intervenor Association for Maximum Service Television, Inc.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioners and intervenors[1] seek review of the Federal Communications Commis-

---

1. Petitioners in these consolidated cases are Community Television, Inc., Pappas Telecasting of Southern California, LLC, Pennsylvania Telecasters Association, and Minority Television Project, Inc. Intervenors in support of petitioners are Paxson Communications Corporation, Corridor Television, LLP, and Entravision Communications Company, LLC. For ease of reference we refer to these parties

sion's final rules establishing the procedures and timetable under which television broadcasting will migrate from the now-prevalent analog technology to digital technology. Digital technology holds the promise of either greatly enhancing the audiovisual quality of television broadcasts or of replicating current quality while liberating substantial portions of the broadcast spectrum for other uses. Because of the massive investment required by broadcasters and consumers, who must purchase digital televisions or converter devices, to accomplish the analog-to-digital transition, the rules under review provide for a ten-year transition period during which licensed broadcasters and those with permits to construct broadcast facilities as of April 3, 1997, have received an additional channel to commence digital broadcasting while continuing analog broadcasts during the transition. At the end of the transition period, analog transmissions will cease; broadcasters will retain their new digital channels and give back to the FCC their analog channels. Thus by statute, essentially all television broadcasting in the United States will be exclusively by digital technology as of December 31, 2006. *See* 47 U.S.C. § 309(j)(14)(A)-(B).

To plan for the transition, the FCC indisputably faced myriad policy choices and a daunting engineering task. Given the complexity and interdependence of the decisions the FCC had to make, the trade-offs among competing interests would be unlikely to satisfy all broadcasters and consumers. Remarkably then, only a few broadcasters, four petitioners supported by three intervenors, challenge the final rules now. They contend that the FCC

acted unlawfully by: (1) granting a second channel to broadcasters whose construction permit applications had been approved by April 3, 1997, while denying a second channel to those whose applications had not been so approved; (2) allotting that second channel to replicate the area served as of April 3, 1997, even if the broadcaster had applied to expand the service area as of that date; (3) adopting and applying its "service replication" principle in a way that unfairly favored VHF broadcasters over UHF broadcasters; and (4) deleting Channel 29 in State College, Pennsylvania and redistributing that spectrum where a would-be broadcaster had sought to apply to operate Channel 29. While petitioners' challenges may be sympathetic, we conclude that the FCC's decisions were neither arbitrary, capricious, nor contrary to law, and accordingly, we deny the petitions for review.

## I.

From its inception, the television broadcasting industry has relied on a common set of technical standards to maximize the availability of television. When the FCC made its first allotment of spectrum for broadcast television in 1941, it also adopted the basic engineering standards devised by the National Television System Committee for monochromatic (black-and-white) television service.[2] *See Notice of Inquiry, In the Matter of Advanced Television Systems and Their Impact on the Existing Television Broadcast Service,* 2 F.C.C.R. 5125, 5126, 1987 WL 344812 (1987). That standard, commonly referred to as NTSC, was revised in 1953 to allow

as "petitioners" except as indicated. Certain other broadcasters withdrew their petitions or the court dismissed their challenges, *see, e.g., Lindsay Television, Inc. v. Association of America's Pub. Television Stations,* 1998 WL 633809 (D.C.Cir. Aug.11, 1998), including Mountain Broadcasting Corporation, which voluntarily withdrew its petition for review after filing its opening brief in light of the FCC's decision to allow it to trade DTV channels with another station. *See Public Notice, Broadcast Actions, Report No. 44600,* 1999

WL 979570 (Oct. 27, 1999). Separately, the Association for Maximum Service Television, Inc. intervened in support of the FCC.

**2.** These standards include the width of the television broadcast channel, the precise frequencies for the visual and aural carriers, the number of lines per frame, the scanning rate and method, the aspect ratio or width-to-height ratio of the picture, and the audio mode.

for color television broadcasting, and again in 1984 to allow for broadcasts using stereophonic sound. *Id.* Relying on the NTSC standard, the FCC maintains the Television Table of Allotments, 47 C.F.R. § 73.606, which is the master plan for allocating NTSC television broadcast channels to communities throughout the country. *See WITN–TV v. FCC,* 849 F.2d 1521, 1522–23 (D.C.Cir.1988). The Table of Allotments designates how many full service, low power, and television translator channels are assigned to each community, *see* 47 C.F.R. §§ 73.601, 73.606, and these designations distinguish between VHF ("very high frequency") Channels 2–13 and UHF ("ultra high frequency") Channels 14–69.

Although the NTSC standard proved to be workable for more than fifty years, in light of the development of new broadcasting technologies, the emergence of competing standards, and the growing popularity of cable television, members of the television broadcasting industry petitioned for a rulemaking in 1987 for the adoption of a new and improved standard for provision of "advanced" television, or "ATV".[3] The FCC obliged. *See Notice of Inquiry,* 2 F.C.C.R. 5125. The development of the rules under review illustrates the difficult policy issues and complex engineering challenges faced by the FCC. At the outset of the rulemaking proceeding, the FCC ordered a freeze on any amendments to the Television Table of Allotments and on all applications for construction permits for vacant television channels in the thirty busiest television markets in order to preserve its options for reallocating spectrum should that become necessary. *See Advanced Television Systems,* 776 Rad. Reg.2d (P&F) 843 (1987) (*"Freeze Order"*). By 1991, the FCC tentatively opined, and ultimately decided that: migration to a new standard would be in the public interest; the transition to a digital standard would not involve rededication of broadcast spectrum; incumbent broadcasters would be the parties best suited to implement the transition to a digital standard; a transition period during which NTSC broadcasts would continue would be necessary; and the width of a digital channel would not exceed the NTSC-standard width of 6 MHz. *Notice of Proposed Rulemaking,* 6 F.C.C.R. at 7024 (*"NPRM"*). To carry out these policies, the FCC proposed to pair DTV channels with analog licenses, providing incumbent broadcasters with a second 6 MHz channel for digital broadcasts (a "DTV channel") without charge for use during the transition period to allow for both digital and NTSC broadcasts. *Id.* at 7025–26. In the period between the initial *NPRM* in 1991 and 1996, following a series of reports and orders and further notices of proposed rulemaking, the FCC's transition plan had been substantially developed.

Then, in 1996, Congress enacted the Telecommunications Act of 1996, Pub.L. No. 101–104, 110 Stat. 56 (1996) ("1996 Act"), preempting to a limited degree some FCC decisions related to the analog-to-digital transition. Thereafter the relevant decisions by the FCC occurred as follows: On July 25, 1996, the FCC adopted its *Sixth Further Notice of Proposed Rulemaking,* 11 F.C.C.R. 10968, 1996 WL 465110 (1996), in which it set forth the proposed DTV Table of Allotments showing which broadcasters would receive which DTV channels.[4] Then, on April 3, 1997, the FCC adopted two reports and orders that are directly at issue. In the *Fifth Report and Order,* 12 F.C.C.R. 12809, 1997 WL 193828 (1997), the FCC issued initial DTV licenses to incumbent broadcasters and set forth the timetable and terms under which the transition to DTV would take place. In the *Sixth Report and Order,* 12 F.C.C.R.

---

3. The FCC adopted the term "ATV" to describe a variety of competing technologies, each of which would improve upon NTSC service. *See Notice of Proposed Rulemaking,* 6 F.C.C.R. 7024, 7024 n. 1, 1991 WL 693244 (1991).

4. On December 27, 1996, the FCC released its *Fourth Report and Order,* 11 F.C.C.R. 17771, 1996 WL 741383 (1996), which adopted a technical DTV standard. Petitioners do not challenge the decisions reflected therein.

14588, 1997 WL 197153 (1997), the FCC promulgated the final DTV Table and set forth its rationale for the decisions reflected therein. In response to petitions for reconsideration, the FCC reaffirmed, clarified, and, in some measure, revised its decisions in two rounds. *See Memorandum Opinion and Order on Reconsideration of the Fifth Report and Order* (*"Service Reconsideration"*), 13 F.C.C.R. 6860, 1998 WL 72373 (1998); *Memorandum Opinion and Order on Reconsideration of the Sixth Report and Order* (*"Allotment Reconsideration"*), 13 F.C.C.R. 7418, 1998 WL 72379 (1998); *Second Memorandum Opinion and Order on Reconsideration of the Fifth and Sixth Report and Orders* (*"SMOOR"*), 14 F.C.C.R. 1348, 1998 WL 879835 (1998).

In Part II of this opinion we address whether the FCC was statutorily barred from issuing DTV licenses in the *Fifth Report and Order*, and if not, whether the FCC arbitrarily failed to grant a second DTV channel to Pappas Telecasting of Southern California, Entravision Communications Company, Corridor Television, and Paxson Communications Corporation. In Part III we address whether the FCC arbitrarily decided not to upgrade the service area covered by the DTV allotments for Community Television, Inc. and Paxson Communications Corporation. In Part IV we address whether the FCC arbitrarily deviated from its service-replication policy when assigning Minority Television Project, Inc.'s digital allotment. And, in Part V we address whether the FCC abused its discretion in eliminating Channel 29 and reassigning its spectrum when the Pennsylvania Telecasters Association sought to apply for a construction permit for the channel and its petition to waive the *Freeze Order* was pending.

## II.

Pappas Telecasting of Southern California, Corridor Television, Paxson Communications Corporation, and Entravision Communications Company (collectively "the pending applicants") contend that the FCC unlawfully deprived them of a second channel for digital broadcasting during the transition period. The FCC's licensing scheme for NTSC channels has two stages. *See Service Reconsideration,* 13 F.C.C.R. at 6862 & n. 7. A potential broadcaster first applies for a permit to construct a television station, and, if the permit is granted, the permittee then applies for a broadcast license. *Id.* The FCC proposed to provide a DTV channel to all parties that held a broadcast license, a construction permit, or had applied for a construction permit as of the October 24, 1991, adoption of the *NPRM. See Second Report/Further Notice,* 7 F.C.C.R. 3340, 3342–44, 1992 WL 690770 (1992). In the event of a "spectrum shortfall" in some communities, licensees and permittees would receive preference. *Id.; see also Third Report/Further Notice,* 7 F.C.C.R. 6924, 6928 , 1992 WL 691027(1992). Pappas and Corridor had both applied for construction permits by October 24, 1991, and were thus, at the time, in the pool of broadcasters eligible for a second channel.

However, during the rulemaking, Congress passed the 1996 Act, which addressed the issue of eligibility for additional television broadcast spectrum in the following terms:

> If the Commission determines to issue additional licenses for advanced television services, the Commission—(1) should limit the initial eligibility for such licenses to persons that, as of the date of such issuance, are licensed to operate a television broadcast station or hold a permit to construct such a station (or both); and (2) shall adopt regulations that allow the holders of such licenses to offer such ancillary or supplementary services on designated frequencies as may be consistent with the public interest, convenience, and necessity.

47 U.S.C. § 336(a).

In the *Fifth Report and Order,* the FCC announced that, pursuant to § 336(a)(1), it had limited initial eligibility for a DTV channel to existing licensees and permittees as of April 3, 1997. 12 F.C.C.R. at

12814–15. The *Fifth Report and Order* also "modified" the licenses or permits of eligible broadcasters to grant them an "additional" license for use of a DTV channel, subject to the conditions set forth therein. *Id.* at 12838. The FCC embodied its grant of these DTV licenses in its final DTV Table of Allotments. *See Sixth Report and Order,* 12 F.C.C.R. at 14693, app. B. Recognizing that the final allocation excluded some broadcasters who had been considered eligible for a DTV channel prior to the 1996 Act, the FCC stated that it would "give particular consideration for assigning temporary DTV channels to new licensees who applied on or before October 24, 1991, given the reliance that these parties may have placed on rules we adopted before passage of the 1996 Act." *Fifth Report and Order,* 12 F.C.C.R. at 12816a n. 26.

In its second opinion on reconsideration of the Fifth and Sixth Reports (*SMOOR*), the FCC denied requests for paired channels by those permittees and licensees whose applications had been pending as of October 24, 1991, but were not granted until after April 3, 1997. While noting its stated intent in the *Fifth Report and Order* to give "particular consideration" to such applicants, the FCC pointed out that it had also notified them of their low priority should there be insufficient spectrum available for DTV channels. *SMOOR,* 14 F.C.C.R. at 1358–60 & n. 36. The FCC also noted that, in reconsidering the Fifth Report (*Service Reconsideration*), it had granted such applicants authority either to construct DTV stations on their NTSC channels immediately, or to convert to DTV service later, and had streamlined the application process for such analog-to-digital modification. *Id.* at 1359–60 (citing *Service Reconsideration,* 13 F.C.C.R. at 6864–66).

■ **A. § 308(a)'s Written–Application Requirement.** Having been deprived of "initial eligibility" for a DTV allotment

by the 1996 Act, the pending applicants first raise a statutory challenge that, if successful, would invalidate the FCC's entire DTV licensing scheme. In the *Fifth Report and Order,* the FCC set forth a three-stage process by which it first determined that all existing broadcasters and permittees as of April 3, 1997, were granted a digital license to broadcast on an additional channel. 12 F.C.C.R. at 12838–40.[5] The FCC then established a procedure by which licensees and permittees would apply to construct facilities for digital transmission and then apply to test and use those facilities. *Id.* at 12840–48. Although the FCC stated in the *Fifth Report and Order* that it was "issu[ing]" DTV licenses, it at the same time clarified that the licenses "issued" in fact were modifications of existing analog television permits or licenses. *Id.* at 12838.

The pending applicants contend that the FCC's "issuance" of these DTV licenses contravened § 308(a), which provides in part that the FCC "may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it," subject to exceptions in times of emergency. 47 U.S.C. § 308(a). They maintain that the Communications Act required each incumbent broadcaster to file a written application for an initial DTV license with the FCC. The second and third stages of the process outlined in the *Fifth Report and Order* each require a written application. In the pending applicants' view, the FCC did not comply with § 308(a) until it issued DTV licenses pursuant to the third stage of the process set forth in the *Fifth Report and Order.* Thus, they continue, the first such license was issued on February 5, 1999, and that date should be used for determining "initial eligibility" under § 336(a)(1). Using this calculus, the pending applicants deem themselves initially eligible for a DTV channel because all of their respective

---

**5.** The three stages are (1) the initial modified license for DTV, (2) certification or application for a construction permit, and (3) application for a license to cover a construction permit for a DTV facility. *Id.*

NTSC construction permits had been granted prior to February 1999.

■ As an initial matter, the FCC contends that this challenge was not raised below and thus is not subject to review. Although it appears that no petitioner directed the FCC's attention specifically to § 308(a) during the rulemaking, comments by another party to that proceeding provided the FCC with a sufficient opportunity to consider the issue such that judicial review is proper. *See* 47 U.S.C. § 405(a). Specifically, the pending applicants rely on the comments of the Media Access Project ("MAP"), that because DTV licenses would be new licenses, the FCC was statutorily required by 47 U.S.C. § 308(b) to determine that each broadcaster receiving such a license was financially qualified. MAP's comments logically implicated § 308(a)'s written application requirement because they were directed to the contents of such applications.

On the merits, the court reviews the FCC's interpretation of the Communications Act under the now-familiar standard set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), by which the court considers "whether Congress has directly spoken to the precise question at issue," *id.* at 842, 104 S.Ct. 2778, and if it has not, "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. We do not agree that the plain language of § 308(a) compels the crimped reading advocated by the pending applicants. Because the recipients of the initial DTV licenses were broadcasters with written applications already on file, § 308(a) must be read in conjunction with

47 U.S.C. § 316, which allows the FCC to modify existing licenses,[6] and new § 336, added by the 1996 Act, which directed the FCC to limit initial eligibility for DTV licenses to incumbent broadcasters (or those holding construction permits for a television broadcast facility). Because Congress did not answer the question of how these provisions apply to the issuance of DTV licenses, we will uphold the FCC's harmonization of the relevant provisions so long as it is reasonable.

In concluding that the FCC's interpretation of its modification authority was reasonable, we are instructed by the court's previous reconciliation of the apparent conflict between § 308(a) and § 316(a)(1), in holding that "[t]he Commission has power under Section 316(a) ... to modify a license without an application for the modification having been made by the licensee." *Peoples Broadcasting Co. v. United States,* 209 F.2d 286, 287 (D.C.Cir.1953). While in *Peoples Broadcasting,* the court affirmed the FCC's power to modify a broadcaster's license by requiring it to shift from Channel 4 to Channel 8, nothing in the statute or that opinion suggests that the FCC's modification power is limited to individual licenses. Rather, the FCC may modify entire classes of licenses. Further, the issuance of transitory DTV licenses in the *Fifth Report and Order* was part of a process that modifies broadcasters' underlying permits and licenses in a way analogous to the modification upheld in *Peoples Broadcasting:* at the end of the transition period, broadcasters will have migrated from one channel to another. While there admittedly is a difference in kind from the circumstances in *Peoples Broadcasting,*

**6.** Section 316(a)(1) provides:

Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with. No such order of

modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall be given reasonable opportunity, of at least thirty days, to protest such proposed order of modification; except that, where safety of life or property is involved, the Commission may by order provide, for a shorter period of notice.

the analog-to-digital transition is limited to a one-time change.

Hence, what the FCC did in the *Fifth Report and Order* is unlike the situation in *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), on which the pending applicants rely. There the Supreme Court held that the FCC's power to "modify" the requirements of 47 U.S.C. § 203, under which telecommunications carriers file their rates in a tariff with the FCC, did not authorize the FCC to do away with tariffs altogether, and that no deference was due to an interpretation that went beyond the meaning that the statute could bear. *Id.* at 229, 114 S.Ct. 2223.[7] While the pending applicants contend that the same reasoning applies here because the FCC's issuance of an initial DTV license cannot reasonably be said to modify a broadcaster's existing license, the FCC has not wrought a fundamental change to the terms of those permits and licenses. Broadcasters will begin and end the transition period broadcasting television programming to the public under very similar terms. Although the FCC chose not to require 100% simulcasting on the NTSC and DTV channels throughout the transition, and Congress disfavored such an approach, *see* 47 U.S.C. § 336(a)(2), broadcasters will provide essentially the same services, with some flexibility to provide ancillary services as well, under their licenses during the transition. *See Service Reconsideration*, 13 F.C.C.R. at 6873–74. Because the issuance of initial DTV licenses to existing broadcasters was not clearly the issuance of new "station licenses" under § 308(a) and because the terms of the DTV licenses can reasonably be considered modifications of existing licenses, the FCC could reasonably deem § 308(a) inapplicable and issue DTV licenses pursuant to § 316.

Finally, the FCC reasonably construed § 336 to allow for the three-stage process set forth in the *Fifth Report and Order*. In the 1996 Act, Congress preempted the ongoing DTV proceeding only to a limited degree. Section 336 overruled the FCC's decision to include applicants for construction permits in the pool of broadcasters eligible for a second channel during the transition period. In most other respects, Congress left the details of managing the analog-to-digital transition to the FCC. Nothing in § 336 foreclosed the FCC from issuing initial DTV licenses on a date certain. Moreover, because Congress limited initial eligibility for DTV licenses to incumbent broadcasters, the FCC could reasonably construe § 336(a)(1)'s reference to "additional licenses for advanced television services" to encompass a modification of existing licenses and permits to allow for advanced television services in addition to then-existing analog broadcasting services. Having adopted a paired channel approach, giving a DTV license to the eligible broadcasters, the FCC's interpretation of its modification power reasonably followed. For as the FCC explained at oral argument, the two reasons for requiring the filing of an application for a new license—to determine who is eligible and how to award licenses in a competitive proceeding—are inapplicable here: Congress has defined who is eligible and there is to be no competition.

For these reasons we conclude that in the *Fifth Report and Order* the FCC reasonably construed the Communications Act to allow it to modify existing broadcast licenses and construction permits to render incumbent broadcasters initially eligible to provide DTV services consistent with § 336(a) and pursuant to § 316(a)(1) without having received written applications for "station licenses" covered by § 308(a).

■ **B. The April 3, 1997, Cut–Off for DTV Eligibility.** In the alternative, the pending applicants contend that even if

7. Subsequently, Congress authorized detariffing. *See MCI WorldCom Inc. v. FCC*, 209

the FCC had authority to issue initial DTV licenses in the *Fifth Report and Order* without having received written applications, the FCC unreasonably interpreted § 336 as requiring it to issue DTV licenses to those eligible under § 336(a)(1) as of a single date rather than account for those with equities on their side, such as Pappas Telecasting of Southern California and Corridor Television who had been eligible for a second channel prior to the 1996 Act. Further, they contend that the FCC failed to adequately explain why it chose not to grant them a second channel.

■ Our review is limited to whether the FCC acted reasonably and adequately explained its decision not to grant the pending applicants a second channel for the transition period. It clearly did. The FCC left no mystery as to its rationale. Notwithstanding the pending applicants' equitable arguments arising out of their disappointment resulting from the 1996 Act, the FCC decided that the spectrum that they sought would be put to better use by providing it to new full power broadcasters as well as new and displaced low power television (LPTV) and TV translator stations. *See SMOOR*, 14 F.C.C.R. at 1359–60. The pending applicants have not shown, in light of § 336, that the date-certain approach was "patently unreasonable, having no relationship to the underlying regulatory problem." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 60 (D.C.Cir.1977); *see also Cassell v. FCC*, 154 F.3d 478, 485 (D.C.Cir.1998). Moreover, the FCC adequately addressed the

equitable concerns of those applicants who were granted construction permits after April 3, 1997, by allowing them to convert to DTV on the channel they are granted and to apply to maximize their service area. *See Service Reconsideration*, 13 F.C.C.R. at 6863–66.[8] As to the substance of the FCC's rationale, it is hardly arbitrary and capricious. The agency reasonably balanced competing demands for spectrum and allowed the pending applicants considerable flexibility in making the transition to DTV.[9]

## III.

■ Community Television, Inc. ("Community") and Paxson Communications Corporation ("Paxson"), each received a second channel but contend that their allotment was inadequate because it does not serve the upgraded service area for which each had applied. As a matter of policy, the FCC decided that it would allot DTV channels in a manner to replicate a broadcaster's existing NTSC service area. *See Sixth Further Notice*, 11 F.C.C.R. at 10974–75. In the *Sixth Further Notice*, the FCC indicated that "we are proposing to allow stations to maximize or increase their service area where such an increase would not create additional interference," *id.* at 10975; however, the FCC cautioned that allowing such modifications would affect the DTV Table, causing both technical difficulties and affecting the ability of broadcasters to comment meaningfully on the draft DTV Table. *Id.* at 10993.

**8.** The FCC's reference in the *Fifth Report and Order* to "particular consideration" for those in the pending applicants' position did not guarantee any particular result, and certainly did not obligate the FCC to take steps beyond the careful balancing of interests reflected in its decision to deny paired channels while increasing flexibility for analog-to-digital conversions for those in the pending applicants' position.

**9.** Pappas contends further that the FCC arbitrarily failed to consider its unique circumstances in that it had applied for a construction permit prior to October 24, 1991 and had presented the FCC with a motion for leave to

supplement its reconsideration petition to show that a DTV channel was available in its community of Avalon, California. The FCC did not grant Pappas' motion for leave and was therefore not obliged to consider its supplement. *See* 47 C.F.R. § 1.429(d). To the extent that the FCC was obliged to articulate its reasons for not granting leave, its failure to do so was harmless. *See* 5 U.S.C. § 706. In rejecting a very similar contention raised by another party, the FCC made clear that the availability of another channel was immaterial to its discretionary decision not to award a DTV channel to petitioners. *See SMOOR* 14 F.C.C.R. at 1358–59.

To balance broadcasters' individual interests in increasing their service areas against the broader interests in establishing a workable DTV Table, the FCC announced in the *Sixth Further Notice* that it would "henceforth condition the grant of applications for modifications of technical facilities, including those for applications on file before the date of the adoption of this Further Notice but granted after that date, on the outcome of our final decision on the DTV Table of Allotments." *Id.* Commenters complained that those broadcasters who had applied to upgrade their service prior to July 25, 1996, the date of issuance of the *Sixth Further Notice,* did so with the expectation that they would receive corresponding digital upgrades and that it would be economically infeasible to invest in an upgrade of analog service only for the transition period.

The FCC partially accommodated such broadcasters. The final DTV Table, issued in the *Sixth Report and Order,* reflected NTSC upgrades that had been granted in the interim between the *Sixth Further Notice* and the *Sixth Report and Order,* that is, between July 25, 1996 and April 3, 1997. Applications that had not been acted upon as of April 3, 1997, remained subject to the condition of noninterference with the DTV Table, and, if granted, would not include a corresponding digital upgrade. *See SMOOR,* 14 F.C.C.R. at 1362–63. Community is licensed to operate Channel 57 in Atlanta, Georgia and had applied to upgrade its NTSC service area prior to the adoption of the *Sixth Further Notice* on July 25, 1996. Because the FCC did not grant Community's application until May 1999, Community's DTV channel, Channel 41, does not replicate its upgraded NTSC service area. Similarly, Paxson had filed eleven upgrade applications prior to July 25, 1996, each of which was granted after April 3, 1997, and therefore did not include a corresponding digital upgrade. Each party may, however, apply for such a digital upgrade. *See* 47 C.F.R. § 73.622, 73.623.

Community and Paxson first contend that the FCC's actions were impermissibly retroactive by subjecting pending upgrade applications to the compatibility principle. However, the mere filing of upgrade applications did not vest petitioners with a legally cognizable expectation interest. *See Chadmoore Comm., Inc. v. FCC,* 113 F.3d 235, 240–41 (D.C.Cir.1997). Thus the FCC was free to alter its criteria for considering those applications. Next, Community and Paxson contend, in essence, that the FCC did not try hard enough to accommodate pending applications during the course of assembling the DTV Table of Allotments. Neither party has demonstrated that the FCC's failure to fashion the DTV Table in a manner that would have granted all upgrade applications pending on July 25, 1996, was a product of administrative whim or sloth. On the contrary, the FCC found that it was not feasible to grant all of the NTSC modification applications. *SMOOR,* 14 F.C.C.R. at 1362.

Paxson contends, however, that it is unable to demonstrate that the FCC acted arbitrarily because the FCC failed to explain why some upgrade applications were granted while others were not. It continues, the FCC cannot reasonably defend its decision to treat those broadcasters whose upgrade applications were granted after April 3, 1997, differently than those whose applications were granted before that date without explaining how it decided which applications to grant on which dates. But the FCC explained that it granted those applications that were consistent with the DTV Table and deferred action on those that were not. We presume that the FCC processed the pending applications with administrative regularity, for neither Community nor Paxson has identified any evidence that rebuts that presumption. *See, e.g., Louisiana Ass'n of Indep. Producers and Royalty Owners v. FERC,* 958 F.2d 1101, 1119 (D.C.Cir.1992); *see also Wilson v. Hodel,* 758 F.2d 1369, 1372–73 (10th Cir.1985). Furthermore, while both Paxson and Community assert that some later-filed applications were granted prior to some earlier-filed applications, there is no indication that administrative irregularities

occurred. Paxson's real complaint is that the FCC fashioned the DTV Table in such a way that its upgrade applications were processed more slowly than others. However, Paxson has not demonstrated why this processing, or the compromises made in the DTV Table, were arbitrary.

## IV.

■ Minority Television Project ("MTP"), licensee of Channel 32 in San Francisco, California, contends that the FCC's "service replication" policy unlawfully puts it at a competitive disadvantage because the policy unnecessarily entrenches the disparity between VHF and UHF channels. Most analog UHF stations have smaller service areas than analog VHF stations, for historical and technical reasons. *See Electronic Indus. Ass'n Consumer Elec. Group v. FCC*, 636 F.2d 689, 691–92 (D.C.Cir.1980). UHF stations are more susceptible to interference. *See id.* at 698 n. 17. Digital technology mitigates interference problems on the UHF band. *See Sixth Report and Order*, 12 F.C.C.R. at 14603–04. Nonetheless, under either an analog or digital transmission system, broadcasting on UHF channels to reach a given audience requires higher power than broadcasting on VHF channels. The FCC set power parameters of 50kW to 1000kW for digital UHF channels. *Id.* at 14605. This meant that some UHF channels would see their service area increased by the minimum power requirement while other broadcasters, who had an analog VHF channel but received a digital UHF channel, would see their service area decreased because of the ceiling on power that could be used for digital broadcasting on the UHF band. MTP's analog and digital channels are both in the UHF band.

MTP's contention that the FCC's service-replication policy arbitrarily entrenches the historical VHF/UHF disparity is in essence a dispute about a policy decision properly within the province of the FCC. Initially the FCC had adopted an approach that would have maximized the service area of each DTV allotment, an approach favored by MTP, and the FCC sought comment on this allocation policy. *See Sixth Further Notice*, 11 F.C.C.R. at 10974–75. However, the FCC ultimately sided with the numerous broadcasters that preferred to replicate the status quo to the greatest extent possible. *See Sixth Report and Order*, 12 F.C.C.R. at 14605–07. While MTP is disappointed by the FCC's choice of its service-replication policy, MTP fails to demonstrate how that choice was unlawful.

In the alternative, MTP contends that the overall DTV allotment for San Francisco, and the allotment MTP received at the minimum UHF power level of 50 kW, are arbitrary because MTP's DTV channel will not reach the audience currently served. MTP does not seriously dispute that its DTV signal will propagate along the same contours as does its NTSC signal. Rather MTP maintains that its DTV allotment lacks sufficient power to penetrate physical obstacles, such as buildings and hills, and therefore its DTV channel will not reach viewers who currently receive its NTSC service. MTP is further concerned that neighboring allotments will not allow it to increase its power if necessary. However, MTP presents no data to demonstrate that the power level of its allotment is so inadequate as to amount to an arbitrary departure from the service-replication policy.[10]

## V.

■ Finally, Pennsylvania Telecasters Association ("PTA") challenges the FCC's decision to reallocate the spectrum that had been set aside for Channel 29 in State College, Pennsylvania without first consid-

---

10. Moreover, should subsequent events bear out MTP's concerns, the FCC states in its brief on appeal that it retains authority to make adjustments to mitigate interference problems that may arise during the analog-to-digital transition. The FCC points out that it has already demonstrated such flexibility in allowing Mountain Broadcasting Corporation to trade DTV channels with another station. *See supra* note 1.

ering PTA's application to broadcast on Channel 29. Channel 29 was one of many vacant NTSC allotments that were deleted in the course of compiling the DTV Table.

To implement its policy to reconfigure spectrum allotments to enable broadcasters using one channel to use two, the FCC needed to identify more than 1900 channels available for assignment to incumbent broadcasters. *See Sixth Further Notice,* 11 F.C.C.R. at 10972. The FCC had issued its *Freeze Order* in 1987, recognizing that any transition plan would require considerable spectrum. Among the vacant channels covered by the *Freeze Order* was Channel 29. The FCC had assigned the channel to State College in 1972 and it had remained vacant until imposition of the *Freeze Order* in 1987. In 1996, the FCC issued its proposed DTV Table in the *Sixth Further Notice* and announced that to facilitate finalization of the DTV Table, it would stop accepting applications for new NTSC stations as of September 20, 1996. *See Sixth Further Notice,* 11 F.C.C.R. at 10993. The FCC noted further that "[t]he DTV Table proposed herein was developed on the assumption that the existing vacant NTSC allotments for which no construction permit application is pending will be deleted." *Id.*

On September 20, 1996, PTA and another would-be broadcaster petitioned the FCC to waive the application of the *Freeze Order* to Channel 29 and to accept their applications for a construction permit for that channel. When the FCC issued its final DTV Table in the *Sixth Report and Order,* the FCC had reassigned the spectrum allotted for Channel 29 in State College to DTV channels serving Johnstown, Pennsylvania and Williamsport, Pennsylvania. PTA petitioned for reconsideration, arguing that the elimination of Channel 29 was contrary to the FCC's commitment to "maintain and protect those vacant NTSC allotments that are the subject of pending applications." *See Sixth Report and Order,* 12 F.C.C.R. at 14639. The FCC denied reconsideration on the ground that PTA's "application has not been accepted, and we have not acted on its waiver re-

quest. The allotment at issue was needed and was used for DTV." *Allotment Reconsideration,* 13 F.C.C.R. at 7601–02.

PTA's petition for review must be denied because it misconstrues the FCC's policy. PTA filed its waiver petition and application for Channel 29 in response to that portion of the *Sixth Further Notice* in which the FCC stated that it would stop accepting applications for vacant analog channels in 30 days and that "we will continue our current policy of considering requests for waiver of our 1987 freeze *Order* on a case-by-case basis." 11 F.C.C.R. at 10992. PTA misread this statement as a promise to consider new applications for unused channels in freeze areas. To the contrary, the FCC promised only that it would consider requests to lift the freeze on a case-by-case basis, not that it would consider unused channel applications prior to lifting the freeze. Indeed, the FCC indicated that applications requiring a lifting of the freeze would not be accepted for filing unless there was a public notice to that effect. *Id.* The FCC ultimately explained that neither PTA's waiver request nor the application had been accepted pursuant to the *Freeze Order,* and that elimination of Channel 29 and reallocation of its spectrum were necessary to accommodate the DTV Table. *Allotment Reconsideration,* 13 F.C.C.R. at 7601–02.

■ The FCC reasonably interpreted its commitment in the *Sixth Report and Order* to maintain and protect vacant NTSC allotments for which applications were pending, 12 F.C.C.R. at 14639, to be limited to applications for vacant allotments not subject to the *Freeze Order* or for which a waiver of the *Freeze Order* had been granted. Because under the terms of the *Sixth Report and Order* PTA's waiver petition did not constrain the FCC's authority to eliminate Channel 29, the FCC acted consistently with its stated expectation that "the existing vacant NTSC allotments for which no construction permit application is pending will be deleted."

**1146**

*Sixth Further Notice,* 11 F.C.C.R. at 10993.[11]

\* \* \* \* \*

We conclude as we began. The FCC faced a host of difficult decisions in designing rules for the transition from analog to digital television broadcasting. After years of work, a small number of the parties to the proceeding have sought relief in the court from unfavorable FCC interpretations and decisions. Even if the compromises reflected in the challenged FCC decisions were not always Solomonic in their wisdom, they were not required to be. Given the relevant statutory directives and regulations, and the competing interests of the various broadcasters and viewers concerning use of limited spectrum, the FCC reasonably and permissibly interpreted its obligations in allocating the valuable public resource that is broadcast spectrum. Accordingly, we deny the petitions for review.

**11.** For this reason, PTA's contention based on the Due Process Clause, U.S. CONST. amend V, is without merit; the FCC did not deprive PTA of a property or liberty interest by deleting Channel 29. Similarly, the FCC did not violate 47 U.S.C. § 307(b), which directs the

FCC to ensure equitable distribution of radio service among communities, because that section applies to the FCC's consideration of "applications for licenses," which PTA's waiver petition was not.