# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 22, 2005          Decided May 6, 2005

No. 04-1037

AMERICAN LIBRARY ASSOCIATION, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

MOTION PICTURE ASSOCIATION OF AMERICA, INC., ET AL.
INTERVENORS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Pantelis Michalopoulos* argued the cause for petitioners. With him on the briefs were *Cynthia L. Quarterman*, *Rhonda M. Bolton*, *Lincoln L. Davies*, and *Gigi B. Sohn*.

*Jacob M. Lewis*, Attorney, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Pate*, Assistant Attorney General, *Catherine G. O'Sullivan* and *James J. Fredricks*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, *Austin C. Schlick*, Deputy General Counsel, *Daniel M. Armstrong*, Associate General Counsel, and *C. Grey Pash, Jr.*, Counsel.

*Christopher Wolf*, *Bruce E. Boyden*, *Mace J. Rosenstein*, and *Catherine E. Stetson* were on the brief for intervenor Motion Picture Association of America, Inc.

Before: EDWARDS, SENTELLE, and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: It is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by Congress. The principal question presented by this case is whether Congress delegated authority to the Federal Communications Commission ("Commission" or "FCC") in the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (2000) ("Communications Act" or "Act"), to regulate apparatus that can receive television broadcasts when those apparatus are not engaged in the process of receiving a broadcast transmission. In the seven decades of its existence, the FCC has never before asserted such sweeping authority. Indeed, in the past, the FCC has informed Congress that it lacked any such authority. In our view, nothing has changed to give the FCC the authority that it now claims.

This case arises out of events related to the nation's transition from analog to digital television service ("DTV"). Since the 1940s, broadcast television stations have transmitted their programs over the air using an analog standard. DTV is a technological breakthrough that permits broadcasters to transmit more information over a channel of electromagnetic spectrum than is possible through analog broadcasting. *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 293 (D.C. Cir. 2003). Congress has set December 31, 2006, as the target date for the replacement of analog television service with DTV. *See* 47 U.S.C. § 309(j)(14).

In August 2002, in conjunction with its consideration of the technological challenges related to the transition from analog

service to DTV, the Commission issued a notice of proposed rulemaking to inquire, *inter alia*, whether rules were needed to prevent the unauthorized copying and redistribution of digital television programming. *See Digital Broadcast Copy Protection*, 17 F.C.C.R. 16,027, 16,028 (2002) ("NPRM"). Thousands of comments were filed in response to the agency's NPRM. Owners of digital content and television broadcasters urged the Commission to require DTV reception equipment to be manufactured with the capability to prevent unauthorized redistributions of digital content. Numerous other commenters voiced strong objections to any such regulations, contending that the FCC had no authority to control how broadcast content is used after it has been received. In November 2003, the Commission adopted "broadcast flag" regulations, requiring that digital television receivers and other devices capable of receiving digital television broadcast signals, manufactured on or after July 1, 2005, include technology allowing them to recognize the broadcast flag. *See Digital Broadcast Content Protection*, 18 F.C.C.R. 23,550 (2003) (codified at 47 C.F.R. pts. 73, 76). The broadcast flag is a digital code embedded in a DTV broadcasting stream, which prevents digital television reception equipment from redistributing broadcast content. The broadcast flag affects receiver devices only *after* a broadcast transmission is complete. The American Library Association, *et al.* ("American Library" or "petitioners"), nine organizations representing a large number of libraries and consumers, filed the present petition for review challenging these rules.

In adopting the broadcast flag rules, the FCC cited no specific statutory provision giving the agency authority to regulate consumers' use of television receiver apparatus after the completion of a broadcast transmission. Rather, the Commission relied exclusively on its ancillary jurisdiction under Title I of the Communications Act of 1934.

The Commission recognized that it may exercise ancillary jurisdiction only when two conditions are satisfied: (1) the Commission's general jurisdictional grant under Title I covers the regulated subject and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities. *See* 18 F.C.C.R. at 23,563. The Commission's general jurisdictional grant under Title I plainly encompasses the regulation of apparatus that can receive television broadcast content, but only while those apparatus are engaged in the process of receiving a television broadcast. Title I does not authorize the Commission to regulate receiver apparatus after a transmission is complete. As a result, the FCC's purported exercise of ancillary authority founders on the first condition. There is no statutory foundation for the broadcast flag rules, and consequently the rules are ancillary to nothing. Therefore, we hold that the Commission acted outside the scope of its delegated authority when it adopted the disputed broadcast flag regulations.

The result that we reach in this case finds support in the All Channel Receiver Act of 1962 and the Communications Amendments Act of 1982. These two statutory enactments confirm that Congress never conferred authority on the FCC to regulate consumers' use of television receiver apparatus *after* the completion of broadcast transmissions.

As petitioners point out, "the Broadcast Flag rules do not regulate interstate 'radio communications' as defined by Title I, because the Flag is not needed to make a DTV transmission, does not change whether DTV signals can be received, and has no effect until after the DTV transmission is complete." Petitioners' Br. at 23. We agree. Because the Commission overstepped the limits of its delegated authority, we grant the petition for review.

## I. BACKGROUND

The Communications Act of 1934 was "implemented for the purpose of consolidating federal authority over communications in a single agency to assure 'an adequate communication system for this country.'" *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 804 (D.C. Cir. 2002) (quoting S. REP. NO. 73-781, at 3 (1934)). Title I of the Act creates the Commission "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Title I further provides that the Commission "shall execute and enforce the provisions" of the Act, *id.*, and states that the Act's provisions "shall apply to all interstate and foreign communication by wire or radio," *id.* § 152(a).

The FCC may act either pursuant to express statutory authority to promulgate regulations addressing a variety of designated issues involving communications, *see*, *e.g.*, 47 U.S.C. § 303(f) (granting the Commission authority to prevent interference among radio and television broadcast stations), or pursuant to ancillary jurisdiction, *see, e.g.*, 47 U.S.C. § 154(i) ("[t]he Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions").

Although somewhat amorphous, ancillary jurisdiction is nonetheless constrained. In order for the Commission to regulate under its ancillary jurisdiction, two conditions must be met. First, the subject of the regulation must be covered by the Commission's general grant of jurisdiction under Title I of the Communications Act, which, as noted above, encompasses "'all interstate and foreign communication by wire or radio.'" *United*

*States v. Southwestern Cable Co.*, 392 U.S. 157, 167 (1968) (quoting 47 U.S.C. § 152(a)). Second, the subject of the regulation must be "reasonably ancillary to the effective performance of the Commission's various responsibilities." *Id.* at 178. Digital television is a technological breakthrough that allows broadcasters to transmit either an extremely high quality video programming signal (known as high definition television) or multiple streams of video, voice, and data simultaneously within the same frequency band traditionally used for a single analog television broadcast. *See Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service,* 11 F.C.C.R. 17,771, 17,774 (1996). In 1997, the FCC set a target of 2006 for the cessation of analog service. *See Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, 12 F.C.C.R. 12,809, 12,850 (1997). Congress subsequently provided that television broadcast licenses authorizing analog service should not be renewed to authorize such service beyond December 31, 2006. *See* 47 U.S.C. § 309(j)(14).

In August 2002, the FCC issued a notice of proposed rulemaking regarding digital broadcast copy protection. *See Digital Broadcast Copy Protection*, 17 F.C.C.R. 16,027 (2002) ("NPRM"). The Commission sought comments on, among other things, whether to adopt broadcast flag technology to prevent the unauthorized copying and redistribution of digital media. *See id.* at 16,028-29. The broadcast flag, or Redistribution Control Descriptor, is a digital code embedded in a digital broadcasting stream, which prevents digital television reception equipment from redistributing digital broadcast content. *See id.* at 16,027. The effectiveness of the broadcast flag regime is dependent on programming being flagged *and* on devices capable of receiving broadcast DTV signals (collectively "demodulator products") being able to recognize and give effect to the flag. Under the rule, new demodulator products (*e.g.*, televisions, computers, etc.) must include flag-

recognition technology. This technology, in combination with broadcasters' use of the flag, would prevent redistribution of broadcast programming. The broadcast flag does not have any impact on a DTV broadcast transmission. The flag's only effect is to limit the capacity of receiver apparatus to redistribute broadcast content after a broadcast transmission is complete.

The NPRM also sought comments on whether the Commission had the authority to mandate recognition of the broadcast flag in consumer electronics devices. *Id.* at 16,029-30. The Commission requested commenters to address whether "this [is] an area in which the Commission could exercise its ancillary jurisdiction under Title I of the Act." *Id.* The FCC also asked "commenters to identify any statutory provisions that might provide the Commission with more explicit authority to adopt digital broadcast copy protection rules," such as 47 U.S.C. § 336(b)(4) and (b)(5), *id.*, which authorize the Commission to regulate the issuance of licenses for digital television services, *see* 47 U.S.C. § 336(a)-(b).

Unsurprisingly, there was an enormous response to the NPRM. The Commission received comments from, among others, owners, producers, and distributors of broadcast television content; consumer electronics manufacturers; consumer interest groups; library associations; and individual consumers. Content owners and television broadcasters argued that, if DTV broadcast content was not protected from the threat of widespread unauthorized redistribution via networks such as the Internet, high value content would migrate from broadcast television to pay television services, which offer a more secure distribution channel. *See Digital Broadcast Content Protection*, 18 F.C.C.R. 23,550, 23,553 (2003) ("*Flag Order*"); Joint Reply Comments of the Motion Picture Association of America, Inc., *et al.*, 2/20/03, *reprinted in* Joint Appendix ("J.A.") 1080, 1088. But there was also overwhelming opposition to the proposed broadcast flag rules. As Commissioner Adelstein noted:

"Thousands of people contacted us and urged us not to [adopt the broadcast flag regime]. Many consumers are concerned about the effect on their use and enjoyment of television, as well as their personal privacy." *See Flag Order*, 18 F.C.C.R. at 23,620 (statement of Commissioner Adelstein, approving in part, dissenting in part). Opponents of regulation argued that the threat from content redistribution was overstated in light of technological limitations to widespread Internet retransmission. *See id.* at 23,553. In addition, critics of the proposed rules expressed concerns about implementation costs and suggested that the broadcast flag both was an inadequate tool to protect content and would stifle innovation. *Id.* at 23,557.

On the question of the Commission's authority to promulgate broadcast flag regulations, proponents pointed to 47 U.S.C. § 336. *See Flag Order*, 18 F.C.C.R. at 23,562. Enacted as part of the Telecommunications Act of 1996, Pub. L. No. 104-104, § 201, 110 Stat. 56, 107, 47 U.S.C. § 336 sets forth certain criteria pursuant to which the Commission may issue new licenses for advanced television services. Proponents also argued that, even if the Commission lacked express statutory authority under § 336, the FCC was authorized to adopt broadcast flag rules pursuant to its ancillary jurisdiction. *See* Joint Comments of the Motion Picture Association of America, Inc., *et al.*, 12/6/02, J.A. 760, 798-807.

Opponents contended that the Commission lacked jurisdiction to implement broadcast flag rules. They pointed out that the plain text of § 336 authorized the FCC to regulate only DTV broadcast licensees and the quality of the signal transmitted by such licensees. *See*, *e.g.*, Reply Comments of Phillips Electronics North America Corp., 2/18/03, J.A. 1012, 1027-28. Critics also maintained that the Commission could not rely on its ancillary jurisdiction to adopt a broadcast flag regime. As one commenter noted:

> [The] unbounded view of FCC jurisdiction [advanced by flag proponents] proves too much. Were it true, the FCC would have plenary authority to regulate consumer electronics and computer devices, and there would have been no need for Congress to delegate authority to the FCC to implement its policy objectives [in various laws authorizing the FCC to regulate specific aspects of consumer electronics].

*Id.*, J.A. 1028-29.

In November 2003, the FCC adopted regulations requiring demodulator products manufactured on or after July 1, 2005 to recognize and give effect to the broadcast flag. *See Flag Order*, 18 F.C.C.R. at 23,570, 23,576, 23,590-91. The Commission explained:

> In this *Report and Order*, we conclude that the potential threat of mass indiscriminate redistribution will deter content owners from making high value digital content available through broadcasting outlets absent some content protection mechanism. Although the threat of widespread indiscriminate retransmission of high value digital broadcast content is not imminent, it is forthcoming and preemptive action is needed to forestall any potential harm to the viability of over-the-air television. Of the mechanisms available to us at this time, we believe that [a broadcast flag] regime will provide content owners with reasonable assurance that DTV broadcast content will not be indiscriminately redistributed while protecting consumers' use and enjoyment of broadcast video programming.

*Id.* at 23,552. The Commission also adopted an interim policy for approving the technologies that could be employed by demodulator products to comply with the requirements of the

*Flag Order* and issued a further notice of proposed rulemaking to address this and other issues. *See id.* at 23,574-79.

In explaining the source of its authority to promulgate the broadcast flag rules, the Commission did not invoke 47 U.S.C. § 336. Rather, the Commission purported to rely solely on its ancillary jurisdiction under Title I of the Communications Act of 1934. *See id.* at 23,563. The Commission found that (1) television receivers are covered by Title I's general jurisdictional grant even when those receivers are not engaged in the process of communication by wire or radio and (2) flag-based regulations are reasonably ancillary to the Commission's regulatory authority to foster a diverse range of broadcast television programs and promote the transition from analog service to DTV. *See id.* at 23,563-66. The Commission acknowledged that "this may be the first time the Commission exercises its ancillary jurisdiction over equipment manufacturers in this manner." *Id.* at 23,566. The Commission nonetheless concluded that "[t]he fact that the circumstances may not have warranted an exercise of such jurisdiction at earlier stages does not undermine our authority to exercise ancillary jurisdiction at this point in time." *Id.*

Commissioner Abernathy issued a separate statement, in which she expressed her support for the *Flag Order*, but noted:

> I have previously expressed concerns about whether we have jurisdiction to adopt a broadcast flag solution, or whether this is an issue best left for Congress. As a general rule, the Commission should be wary of adopting significant new regulations where Congress has not spoken. On balance, though, I believe that given the broad congressional direction to promote the transition to digital broadcasting, a critical part of that obligation involves protection of content that is transmitted via free over-the-air-broadcasting. I am hopeful that any court review of this decision can occur before the effective date of our rules.

*Id.* at 23,614 (separate statement of Commissioner Abernathy). Commissioners Copps and Adelstein dissented in part from the issuance of the *Flag Order*. Commissioner Copps dissented "because the [regulations did] not preclude the use of the flag for news or for content that is already in the public domain" and "because the criteria adopt[ed] for accepting digital content protection technologies fail to address . . . the impact . . . on personal privacy." *Id*. at 23,616-17 (Statement of Commissioner Copps). Commissioner Adelstein dissented because the regulations did "not rule out the use of the flag for content that is in the public domain." *Id*. at 23,620 (Statement of Commissioner Adelstein).

The instant petition for review, filed by nine organizations representing numerous libraries and consumers, challenges the FCC's *Flag Order* on three grounds: (1) the Commission lacks statutory authority to mandate that demodulator products recognize and give effect to the broadcast flag; (2) the broadcast flag regime impermissibly conflicts with copyright law; and (3) the Commission's decision is arbitrary and capricious for want of reasoned decisionmaking. The Motion Picture Association of America ("MPAA") intervened in support of the Commission. In its brief to the court, MPAA also contested petitioners' Article III standing. After hearing oral argument, the court requested additional submissions from the parties on the question of standing. *See Am. Library Ass'n v. FCC*, 401 F.3d 489 (D.C. Cir. 2005) ("*Am. Library I*").

As explained below, we are now satisfied that at least one member of one of the petitioner groups has standing to pursue this challenge to the FCC's broadcast flag rules. The court therefore has jurisdiction to consider the petition for review. On the merits, we hold that the FCC lacked statutory authority to impose the broadcast flag regime. Therefore, we grant the petition for review without reaching petitioners' other challenges to the *Flag Order*.

## II. ANALYSIS

### A. *Standing*

Before addressing the merits of petitioners' claims, we must first determine whether they have demonstrated that they have Article III standing, a prerequisite to federal court jurisdiction. *Am. Library I*, 401 F.3d at 492. Associations such as petitioners have representational standing under Article III if (1) at least one of their members has standing, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit. *Id*. As we noted in *American Library I*, we have no reason to doubt that petitioners satisfy the latter two requirements, and neither the FCC nor intervenor MPAA has suggested otherwise. Therefore, the focus of our inquiry here is whether at least one member of a petitioner group has standing to sue in its own right. *Id.*

In order to meet this first prong of the associational standing test, at least one member of a petitioning group must satisfy "the three elements that form the 'irreducible constitutional minimum of standing.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). These elements are: (1) injury in fact, (2) causation, and (3) redressability. *See id.* at 492-93 (citing *Defenders of Wildlife,* 504 U.S. at 560-61). The "only thing at issue in this case is the injury-in-fact prong of Article III standing, for causation and redressability are obvious if petitioners can demonstrate injury." *Id.* at 493. Furthermore, as we have already made clear,

> [w]ith regard to the injury-in-fact prong of the standing test, petitioners need not prove the merits of their case in order to demonstrate that they have Article III standing. Rather, in order to establish injury in fact, petitioners must show that there is a substantial probability that the FCC's order

will harm the concrete and particularized interests of at least one of their members.

*Id.* (citations omitted).

In response to our decision in *American Library I*, petitioners submitted a brief, accompanied by 13 affidavits from individual members and individuals representing their member organizations, to demonstrate their standing. These materials included an affidavit executed by Peggy Hoon, the Scholarly Communication Librarian at the North Carolina State University ("NCSU") Libraries in Raleigh, North Carolina, a member of petitioner Association of Research Libraries. Affidavit of Peggy Hoon, 3/29/05, ¶ 1. Ms. Hoon's affidavit asserts that the NCSU Libraries assist faculty members who would like to make broadcast materials available to students in distance learning courses via the Internet. The affidavit states that the NCSU Libraries currently assist a professor in the Foreign Languages and Literatures Department make short broadcast clips of the Univision network's program, *El Show de Christina*, available over the Internet on a password-protected basis for use in a distance-education Spanish language course. The affidavit alleges that Internet redistribution is essential to making such clips available. *See id*. ¶¶ 5-10. The FCC does not dispute that the NCSU Libraries' activities are lawful. And as petitioners point out, if the regulations implemented by the *Flag Order* take effect, there is a substantial probability that the NCSU Libraries would be prevented from assisting faculty to make broadcast clips available to students in their distance-learning courses via the Internet.

At oral argument, counsel for the FCC stated explicitly that the Commission is not challenging petitioners' standing in this case. Recording of Oral Argument at 29:01-:18. In its supplemental brief, the Commission again does not raise a challenge to petitioners' standing. Instead, the Commission merely responds on the merits, taking issue with certain

statements in petitioners' supplemental brief and affidavits about the breadth of the broadcast flag regime. *See* FCC Supp. Br. at 3.

Intervenor MPAA, which does challenge petitioners' standing, argues that any injury suffered by the Libraries following the FCC's implementation of the broadcast flag regulations will be "due solely to the independent . . . decisions of third parties not before this Court." MPAA Supp. Br. at 6. In other words, MPAA assumes that, because hardware manufacturers eventually might be able to gain approval for apparatus that allow for greater distribution of broadcast content in a manner that is consistent with the *Flag Order*, it will be the unavailability of this new technology and not the agency's enforcement of the broadcast flag rule that causes injury to petitioners. Thus, under MPAA's view, redress for petitioners must come from the hardware manufacturers, not the FCC. This is a specious argument.

There is clearly a substantial probability that, if enforced, the *Flag Order* will immediately harm the concrete and particularized interests of the NCSU Libraries. Absent the *Flag Order*, the Libraries will continue to assist NCSU faculty members make broadcast clips available to students in distance-education courses via the Internet, but there is a substantial probability that the Libraries will be unable to do this if the *Flag Order* takes effect. It is also beyond dispute that, if this court vacates the *Flag Order*, the Libraries will be able to continue to assist faculty members lawfully redistribute broadcast clips to their students.

In short, it is clear that, on this record, the NCSU Libraries have satisfied the requisite elements of Article III standing: injury in fact, causation, and redressability. Therefore, the Association of Research Libraries also has standing. *See Am. Library I*, 401 F.3d at 492. Because only one member of a petitioning organization must have standing in order for the

court to have jurisdiction over a petition for review, *see Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004), it is unnecessary for us to consider any of the other grounds offered by petitioners to demonstrate their standing. We therefore move to the question of whether the Commission acted in excess of its statutory authority in promulgating the *Flag Order*.

**B.** *The Limits of the FCC's Delegated Authority Under the Communications Act*

In defending the *Flag Order* and the broadcast flag regulations contained therein, the Commission contends that it

> reasonably interpreted the Communications Act as granting it jurisdiction to establish technical requirements for television receiving equipment in order to fulfill its responsibility of implementing the transition to digital television. Sections 1 and 2(a) of the Act, 47 U.S.C. 151, 152(a), confer on the agency regulatory jurisdiction over all interstate radio and wire communication. Under the definitional provisions of section 3, 47 U.S.C. 153, those communications include not only the transmission of signals through the air or wires, but also "all instrumentalities, facilities, [and] apparatus" associated with the overall circuit of messages sent and received – such as digital television receiving equipment.
>
> . . . .
>
> . . . [T]he Commission has the authority to promulgate regulations to effectuate the goals and provisions of the Act even in the absence of an explicit grant of regulatory authority, if the regulations are reasonably ancillary to the Commission's specific statutory powers and responsibilities.

FCC Br. at 17, 23-24.

Petitioners counter that

> [t]he FCC has asserted jurisdiction it does not have. . . . The FCC claims no specific statutory authority allowing it to meddle so radically in the nation's processes of technological innovation, but instead cites to its latent "ancillary" jurisdiction, which the FCC astonishingly contends is boundless unless Congress specifically acts to limit it.
>
> . . . [I]n no circumstance can the FCC regulate an activity that is not an interstate "communication" by radio or wire, and the Broadcast Flag rules regulate neither. The Broadcast Flag does not dictate how DTV transmissions are made, but simply controls how the transmitted content can be treated *after* it is received. . . . [T]he Communications Act is clear that, unless specified elsewhere, it gives the FCC authority over receipt "services," not the receipt "apparatuses" the agency now attempts to regulate.

Petitioners' Br. at 19-20.

As noted above, the principal issue in this case is whether the Commission acted outside the scope of its delegated authority when it adopted the disputed broadcast flag regulations. The FCC, like other federal agencies, "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Commission "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). Hence, the FCC's power to promulgate legislative regulations is limited to the scope of the authority Congress has delegated to it. *Id.* (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

1. *The Applicable Standard of Review*

In assessing whether the Commission's *Flag Order* exceeds the agency's delegated authority, we apply the familiar standards of review enunciated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). In reviewing agency action under *Chevron*, "if the intent of Congress is clear," the court "must give effect to [that] unambiguously expressed intent." *Chevron*, 467 U.S. at 842-43 ("*Chevron* Step One"). If "Congress has not directly addressed the precise question at issue," and the agency has acted pursuant to an express or implied delegation of authority, the agency's statutory interpretation is entitled to deference, as long as it is reasonable. *Id.* at 843-44 ("*Chevron* Step Two"). The FCC argues here that the court should defer to the agency's interpretation of its ancillary jurisdiction under *Chevron*, because, in its view, the regulations promulgated in the *Flag Order* reflect a reasonable application of the agency's ancillary authority under the Communications Act. The agency's self-serving invocation of *Chevron* leaves out a crucial threshold consideration, *i.e.*, whether the agency acted pursuant to delegated authority.

As the court explained in *Motion Picture Ass'n of America, Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("*MPAA*"), an "agency's interpretation of [a] statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." The court observed that the Supreme Court's decision in *Mead* "reinforces" the command in *Chevron* that "deference to an agency's interpretation of a statute is due only when the agency acts pursuant to 'delegated authority.'" *Id.* (quoting *Mead*, 533 U.S. at 226). *See also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399 (D.C. Cir. 2004); *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004); *AT&T Corp. v. FCC*, 323 F.3d 1081, 1086 (D.C. Cir. 2003); *Ry.*

*Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670-71 (D.C. Cir. 1994) (en banc).

In *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003), the court explained:

> *"Chevron* is principally concerned with whether an agency has authority to act under a statute." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995). *Chevron* analysis "is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Id.*; *see also Mead*, 533 U.S. at 226-27 (holding that *Chevron* deference is due only when the agency acts pursuant to "delegated authority").
>
> . . . .
>
> An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority. It does not matter whether the unlawful action arises because the disputed regulation defies the plain language of a statute or because the agency's construction is utterly unreasonable and thus impermissible.

*Id.* at 1174.

Petitioners' principal claim here is that the challenged broadcast flag regulations emanated from an *ultra vires* action by the FCC. We agree. This being the case, the regulations cannot survive judicial review under *Chevron/Mead*. Our judgment is the same whether we analyze the FCC's action under the first or second step of *Chevron*. "In either situation, the agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." *MPAA*, 309 F.3d at 801 (citing

*Ry. Labor Executives*, 29 F.3d at 671). In this case, as explained below, the FCC's interpretation of its ancillary jurisdiction reaches well beyond the agency's delegated authority under the Communications Act. We therefore hold that the broadcast flag regulations exceed the agency's delegated authority under the statute.

2. *Ancillary Jurisdiction Under the Communications Act of 1934*

As explained above, the only basis advanced by the Commission as a source for its authority to adopt the broadcast flag regime was its ancillary jurisdiction under Title I of the Communications Act of 1934. *See Flag Order*, 18 F.C.C.R. at 23,563-64. As the Commission recognized, its ancillary jurisdiction is limited to circumstances where: (1) the Commission's general jurisdictional grant under Title I covers the subject of the regulations and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities. *See id.* at 23,563 (citing *Southwestern Cable*, 392 U.S. at 177-78).

The insurmountable hurdle facing the FCC in this case is that the agency's general jurisdictional grant does not encompass the regulation of consumer electronics products that can be used for receipt of wire or radio communication when those devices are not engaged in the process of radio or wire transmission. Because the *Flag Order* does not require demodulator products to give effect to the broadcast flag until *after* the DTV broadcast has been completed, the regulations adopted in the *Flag Order* do not fall within the scope of the Commission's general jurisdictional grant. Therefore, the Commission cannot satisfy the first precondition to its assertion of ancillary jurisdiction.

The Supreme Court has delineated the parameters of the Commission's ancillary jurisdiction in three cases: *United*

*States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), *United States v. Midwest Video Corp.*, 406 U.S. 649 (1972) ("*Midwest Video I*"), and *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) ("*Midwest Video II*"). In *Southwestern Cable* and *Midwest Video I*, the Court upheld the Commission's regulation of cable television systems as a valid exercise of its ancillary jurisdiction, but also made clear that the Commission's ancillary authority has limits. In *Midwest Video II*, the Court found that the Commission had overstepped those limits. Because *Southwestern Cable*, *Midwest Video I*, and *Midwest Video II* are central to our analysis of whether the Commission lawfully exercised its ancillary jurisdiction in this case, we discuss these cases in some detail.

In *Southwestern Cable*, the Supreme Court recognized that the Communications Act confers a sphere of ancillary jurisdiction on the FCC. *See* 392 U.S. at 177-78. The principal question presented was whether the FCC had the authority to regulate cable television systems ("CATV"), absent any express congressional grant of authority to the FCC to regulate in this area. *See id.* at 164-67. The Court's conclusion that the FCC did have such authority rested on two factors. First, it was beyond doubt that CATV systems involved interstate "'communication by wire or radio,'" *id.* at 168 (quoting 47 U.S.C. § 152(a)), and, thus, were covered by Title I's general jurisdictional grant. Second, the Court concluded that at least some level of CATV regulation was "reasonably ancillary to the effective performance of the Commission's various responsibilities [delegated to it by Congress] for the regulation of television broadcasting." *Id.* at 178. Because these two conditions were satisfied, the Court held that, to the degree it was in fact reasonably ancillary to the Commission's responsibilities over broadcast, the FCC had the power to regulate cable television as "'public convenience, interest or necessity requires,'" so long as the regulations were "'not inconsistent with law.'" *Id.* (quoting 47 U.S.C. § 303(r)).

Four years later, the Court applied the two-part test enunciated in *Southwestern Cable* to review a rule adopted by the FCC providing that no CATV system with 3,500 or more subscribers could carry the signal of any television broadcast station unless the system distributed programming that had originated from a source other than the broadcast signals and the system had facilities for local program production. *See Midwest Video I*, 406 U.S. at 653-54 & n.6. The regulation was designed to increase the number of outlets for community self-expression and the programming choices available to the public. *See id.* at 654.

A closely divided Court held that the Commission's rule was a valid exercise of its ancillary jurisdiction. In an opinion by Justice Brennan, a plurality of the Court began its analysis by recognizing the two requirements for the Commission's exercise of ancillary jurisdiction: (1) that the regulation must cover interstate or foreign communication by wire or radio and (2) that the regulation must be reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities. *See id.* at 662-63. The parties before the Court in *Midwest Video I* did not dispute that the first precondition was met. *See id.* at 662. Furthermore, the plurality concluded that the regulation was reasonably ancillary to the Commission's responsibilities for the regulation of broadcast television, because the Commission reasonably concluded that the rule would "'further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services.'" *Id.* at 667-68 (quoting Commission report accompanying the disputed regulation).

Chief Justice Burger provided the fifth vote to sustain the regulation at issue in *Midwest Video I*, but he concurred only in the judgment. Chief Justice Burger agreed that, in light of the

"pervasive powers" conferred upon the Commission and its "generations of experience," the Court should sustain the Commission's authority to impose the regulation at issue. *Id.* at 676 (Burger, C.J., concurring in the result). Nonetheless, he noted: "Candor requires acknowledgment, for me at least, that the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts." *Id.*

Seven years later, in *Midwest Video II*, the Court considered whether another FCC effort to regulate cable television was a permissible exercise of the Commission's ancillary jurisdiction. This time the Court decided that the Commission had gone too far. The rules at issue required that cable television systems carrying broadcast signals and having at least 3,500 subscribers develop at least a 20-channel capacity, make certain channels available for third-party access, and furnish equipment for access purposes. 440 U.S. at 691. The Court held that the rules exceeded the Commission's authority. *Id.* at 708-09. Specifically, because the Communications Act explicitly directed the Commission not to treat broadcasters as common carriers, the Court concluded that it was not reasonably ancillary to the Commission's effective performance of its responsibilities relating to broadcast television for the Commission to impose common-carrier obligations on cable television systems. *See id.* at 702-05, 708-09. While the Court recognized that the statutory bar on treating broadcasters as common carriers did not apply explicitly to cable systems, the Court explained that, "without reference to the provisions of the Act directly governing broadcasting, the Commission's jurisdiction under [Title I] would be unbounded." *Id.* at 706. The Court refused to countenance such a boundless view of the Commission's jurisdiction, noting that, "[t]hough afforded wide latitude in its supervision over communication by wire, the Commission was not delegated unrestrained authority." *Id.* As the Commission correctly explained in the *Flag Order*, *Midwest Video II* stands

for the proposition that "if the basis for jurisdiction over cable is that the authority is ancillary to the regulation of broadcasting, the cable regulation cannot be antithetical to a basic regulatory parameter established for broadcast." *Flag Order*, 18 F.C.C.R. at 23,563 n.70.

The Court's decisions in *Southwestern Cable*, *Midwest Video I,* and *Midwest Video II* were principally focused on the second prong of the ancillary jurisdiction test.   This is unsurprising,   because the subject matter of the regulations at issue in those cases – cable television – constituted interstate communication by wire or radio, and thus fell within the scope of the Commission's general jurisdictional grant under Title I of the Communications Act.  However, these cases leave no doubt that the Commission may not invoke its ancillary jurisdiction under Title I to regulate matters outside of the compass of communication by wire or radio.  As we have explained:

> While the Supreme Court has described the jurisdictional powers of the FCC as . . . expansive, there are limits to those powers.  No case has ever permitted, and the Commission has never, to our knowledge, asserted jurisdiction over an entity not engaged in "communication by wire or radio."

*Accuracy in Media, Inc. v. FCC*, 521 F.2d 288, 293 (D.C. Cir. 1975) (additional internal quotation marks omitted) (citing *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943)); *see also id.* at 294 ("Jurisdiction over CATV [in *Southwestern Cable*] was expressly predicated upon a finding that the transmission of video and aural signals via the cable was 'interstate . . . communication by wire or radio.'"   (quoting *Southwestern Cable*, 392 U.S. at 168)); *Midwest Video I*, 406 U.S. at 662 (making clear that the Commission's jurisdiction is limited to activities involving communication by wire or radio).   This principle is crucial, because the issue here is precisely whether

the *Flag Order* asserts jurisdiction over matters that are beyond the compass of wire or radio communication.

*Southwestern Cable*, *Midwest Video I*, and *Midwest Video II* are also relevant to the present controversy for a second reason. In each of these decisions, the Court followed a very cautious approach in deciding whether the Commission had validly invoked its ancillary jurisdiction, even when the regulations under review clearly addressed "communication by wire or radio." As the Seventh Circuit has noted: "The Court [in *Southwestern Cable*] appeared to be treading lightly even where the activity at issue" involved cable television, which "easily falls within" Title I's general jurisdictional grant. *Ill. Citizens Comm. for Broad. v. FCC*, 467 F.2d 1397, 1400 (7th Cir. 1972). The Seventh Circuit's characterization is equally apt with respect to the Court's opinions in *Midwest Video I* and *Midwest Video II*.

We think that the Supreme Court's cautionary approach in applying the second prong of the ancillary jurisdiction test suggests that we should be *at least* as cautious in this case. Great caution is warranted here, because the disputed broadcast flag regulations rest on no apparent statutory foundation and, thus, appear to be ancillary to nothing. Just as the Supreme Court refused to countenance an interpretation of the second prong of the ancillary jurisdiction test that would confer "unbounded" jurisdiction on the Commission, *Midwest Video II*, 440 U.S. at 706, we will not construe the first prong in a manner that imposes no meaningful limits on the scope of the FCC's general jurisdictional grant.

In light of the parameters of the Commission's ancillary jurisdiction established by *Southwestern Cable*, *Midwest Video I*, and *Midwest Video II*, this case turns on one simple fact: the *Flag Order* does not require demodulator products to give effect to the broadcast flag until *after* the DTV broadcast is complete. The *Flag Order* does not regulate the actual transmission of the

DTV broadcast. In other words, the *Flag Order* imposes regulations on devices that receive communications after those communications have occurred; it does not regulate the communications themselves. Because the demodulator products are not engaged in "communication by wire or radio" when they are subject to regulation under the *Flag Order*, the Commission plainly exceeded the scope of its general jurisdictional grant under Title I in this case.

In seeking to justify its assertion of jurisdiction in the *Flag Order*, the Commission relies on the fact that the Communications Act defines "radio communication" and "wire communication" to include not only the "transmission of . . . writing, signs, signals, pictures, and sounds" by aid of wire or radio, but also "all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(33) (defining "radio communication"); *id.* § 153(52) (defining "wire communication"). The *Flag Order* asserts: "Based on this language, [the Commission finds] that television receivers are covered by the statutory definitions and therefore come within the scope of the Commission's general authority outlined in [Title I] of the Communications Act." 18 F.C.C.R. at 23,563-64. The Commission thus apparently believed that, given the definitions of "wire communication" and "radio communication" in Title I, it could assert jurisdiction over television receivers even when those receivers were not engaged in broadcast transmission simply because they are apparatus used for the receipt of communications. *See also* FCC Br. at 26. We reject this position, for it rests on a completely implausible construction of the Communications Act.

The statute does not give the FCC authority to regulate *any* "apparatus" that is associated with television broadcasts. Rather, the statutory language cited by the FCC refers only to "apparatus" that are "incidental to . . . transmission." In other

words, the language of § 153(33) and (52) plainly does not indicate that Congress intended for the Commission to have general jurisdiction over devices that can be used for receipt of wire or radio communication when those devices are not engaged in the process of radio or wire transmission.

The language relied upon by the Commission in the statutory definitions of "wire communication" and "radio communication" was part of the original Communications Act of 1934. *See* Pub. L. No. 73-416, § 3(a)-(b), 48 Stat. 1064, 1065; *see also Southwestern Cable*, 392 U.S. at 168 (quoting this language). The Commission acknowledges that, in the more than 70 years that the Act has been in existence, it has never previously sought to exercise ancillary jurisdiction over reception equipment *after* the transmission of communication is complete. *See* Recording of Oral Argument at 34:45-35:23. This is not surprising, since the Commission's current interpretation of the statute's definitional language would render step one of the Supreme Court's two-part test for determining whether a subject is within the Commission's ancillary jurisdiction essentially meaningless.

We can find nothing in the statute, its legislative history, the applicable case law, or agency practice indicating that Congress meant to provide the sweeping authority the FCC now claims over receiver apparatus. And the agency's strained and implausible interpretations of the definitional provisions of the Communications Act of 1934 do not lend credence to its position. As the Supreme Court has reminded us, Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). In sum, we hold that, at most, the Commission only has general authority under Title I to regulate apparatus used for the receipt of radio or wire communication while those apparatus are engaged in communication.

Our holding is consistent with the Seventh Circuit's well-reasoned decision in *Illinois Citizens*, which concluded that the FCC may not lawfully exercise jurisdiction over activities that do not constitute communication by wire or radio. *See* 467 F.2d at 1399-1400. In that case, the Illinois Citizens Committee for Broadcasting filed a complaint with the FCC, alleging that the proposed construction of the Sears Tower in Chicago "would throw 'multiple ghost images' on television receivers in many areas of the Greater Chicago Metropolitan Area." *Id.* at 1398. The petitioners called upon the FCC to take steps to prevent this interference, including, if necessary, ordering Sears, Roebuck & Co. to cease construction of the tower until the company had taken measures to ensure that television viewers would continue to receive an adequate signal. The Commission denied the requested relief on the ground that it lacked jurisdiction over the construction of the Sears Tower, and the Illinois Citizens Committee sought review by the Seventh Circuit. *See id.* at 1398-99.

The Illinois Citizens Committee argued that, in light of *Southwestern Cable*, the FCC had the power to regulate "all activities which 'substantially affect communications.'" *Id.* at 1399. The Seventh Circuit flatly rejected this argument as unsupported by the Communications Act or judicial decisions interpreting the Act:

> While we appreciate the need for a flexible approach to FCC jurisdiction, we believe the scope advanced by petitioners is far too broad. The "affecting communications" concept would result in expanding the FCC's already substantial responsibilities to include a wide range of activities, whether or not actually involving the transmission of radio or television signals much less being remotely electronic in nature. Nothing before us supports this extension.

*Id.* at 1400 (footnote omitted).

In *Motion Picture Ass'n*, this court concluded that the Commission lacked authority under Title I of the Communications Act to promulgate regulations that significantly implicated program content. Focusing specifically on 47 U.S.C. § 151, which is part of Title I and which the FCC conceded was the only possible source of authority that could justify its adoption of the video description rules at issue in the case, we explained:

> Under [§ 151], Congress delegated authority to the FCC to expand radio and wire transmissions, so that they would be available to all U.S. citizens. Section [151] does not address the *content* of the programs with respect to which accessibility is to be ensured. In other words, the FCC's authority under [§ 151] is broad, but not without limits.

309 F.3d at 804 (full citations omitted) (citing *Midwest Video I*, 406 U.S. at 667-68, and *Southwestern Cable*, 392 U.S. at 172). Just as no provision in Title I addresses program content, no provision in Title I addresses requirements for demodulator products not engaged in communication by wire or radio.

In sum, because the rules promulgated by the *Flag Order* regulate demodulator products after the transmission of a DTV broadcast is complete, these regulations exceed the scope of authority Congress delegated to the FCC. And because the Commission can only issue regulations on subjects over which it has been delegated authority by Congress, the rules adopted by the *Flag Order* are invalid at the threshold jurisdictional inquiry. As was true in *Aid Ass'n for Lutherans*, "our judgment in this case is the same whether we analyze the agency's statutory interpretation under *Chevron* Step One or Step Two. 'In either situation, the agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue.'" 321 F.3d at 1175 (quoting *MPAA*, 309 F.3d at 801). "An agency construction of a statute cannot survive judicial review if a contested regulation

reflects an action that exceeds the agency's authority." *Id*. at 1174. It does not matter whether the unlawful action arises because the regulations at issue are "contrary to clear congressional intent" as ascertained through use of the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, or "utterly unreasonable and thus impermissible." *Aid Ass'n for Lutherans*, 321 F.3d at 1174. The FCC has no congressionally delegated authority to regulate receiver apparatus after a transmission is complete. We therefore hold that the broadcast flag regulations exceed the agency's delegated authority under the statute.

### 3. *Subsequent Congressional Legislation*

We think that, for the reasons discussed above, the FCC *never* has possessed ancillary jurisdiction under the Communications Act of 1934 to regulate consumer electronic devices that can be used for receipt of wire or radio communication when those devices are not engaged in the process of radio or wire transmission. Indeed, in the more than 70 years of the Act's existence, the Commission has neither claimed such authority nor purported to exercise its ancillary jurisdiction in such a far-reaching way. *See Flag Order*, 18 F.C.C.R. at 23,566 ("We recognize that the Commission's assertion of jurisdiction over manufacturers of equipment in the past has typically been tied to specific statutory provisions and that this is the first time the Commission has exercised ancillary jurisdiction over consumer equipment manufacturers in this manner.").

The Commission weakly attempts to dismiss this history by suggesting that "Congressional admonitions and past Commission assurances of a narrow exercise of authority over manufacturers (such as those reflected in the [All Channel Receiver Act] and its legislative history) are properly limited to the context of those explicit authorizations. The regulations here do not fall within the subject matter of those explicit

authorizations." *Id*. (footnote omitted). This cryptic statement surely cannot justify the FCC's overreaching for regulatory authority that Congress has never granted. As we held in *Aid Ass'n for Lutherans*:

> In this case, the [agency]'s position seems to be that the disputed regulations are permissible because the statute does not expressly foreclose the construction advanced by the agency. We reject this position as entirely untenable under well-established case law. *See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.") (emphasis in original); *see also Halverson v. Slater*, 129 F.3d 180, 187 (D.C. Cir. 1997) (quoting *Ry. Labor Executives*, 29 F.3d at 671); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 46 F.3d 82, 90 (D.C. Cir. 1995) (same); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse . . . to presume a delegation of power merely because Congress has not expressly withheld such power."); *Natural Res. Def. Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) ("'[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.'") (alteration in original) (quoting *Kansas City v. Dep't of Hous. & Urban Dev*., 923 F.2d 188, 191-92 (D.C. Cir. 1991)).

321 F.3d at 1174-75.

It is enough here for us to find that the Communications Act of 1934 does not indicate a legislative intent to delegate authority to the Commission to regulate consumer electronic devices that can be used for receipt of wire or radio

communication when those devices are not engaged in the process of radio or wire transmission. That is the end of the matter. It turns out, however, that subsequent legislation enacted by Congress *confirms* the limited scope of the agency's ancillary jurisdiction and makes it clear that the broadcast flag regulations exceed the agency's delegated authority under the statute.

The first such congressional enactment of note is the All Channel Receiver Act ("ACRA"), Pub. L. No. 87-529, 76 Stat. 150 (codified at 47 U.S.C. §§ 303(s), 330(a)). Enacted in 1962, the ACRA granted the Commission authority to require that televisions sold in interstate commerce are "capable of adequately receiving all frequencies allocated by the Commission to television broadcasting." 47 U.S.C. § 303(s). *See Elec. Indus. Ass'n Consumer Elecs. Groups v. FCC*, 636 F.2d 689 (D.C. Cir. 1980) ("*EIA*") (offering an extensive review of the legislative history of the ACRA). The original version of the All Channel Receiver Act "would have given the Commission the authority to set 'minimum performance standards' for all television receivers shipped in interstate commerce." *Id.* at 694 (quoting S. REP. NO. 87-1526, at 7 (1962)). However, in response to criticism about giving the FCC such broad authority over television receiver design, the "minimum performance standards" language was deleted before the bill passed the House. The version that passed the House would have instead given the Commission the authority to require that television sets "be capable of receiving all frequencies allocated by the Commission to television broadcasting." *Id.* (quoting H.R. REP. NO. 87-1559, at 1 (1962)). FCC Chairman Newton Minnow then wrote the chair of the Senate Subcommittee on Communications expressing his concern that under the House version, "'we may be powerless to prevent the shipment . . . of all-channel sets having only the barest capability for receiving UHF signals, and which therefore would not permit satisfactory and usable reception of such

signals in a great many instances.'" *Id.* at 695 (alteration in original) (quoting the letter). The Senate amended the bill, and the version that was ultimately enacted allowed the FCC to require television receivers sold in interstate commerce to be "capable of *adequately* receiving all frequencies allocated by the Commission to television broadcasting." 47 U.S.C. § 303(s) (emphasis added).

It is clear, however, that, in enacting the ACRA, Congress did not "give the Commission unbridled authority" to regulate receiving apparatus. *EIA*, 636 F.2d at 696. This was confirmed when the Commission attempted to set a standard requiring television manufacturers to take steps to improve the quality of UHF reception beyond what could be attained with then-existing technology. On review, this court ruled that the Commission overstepped its delegated authority and vacated the Commission's action. *See id.* at 698. The court held that, while the ACRA granted the Commission "limited . . . authority to ensur[e] that all sets 'be capable of *adequately* receiving' all television frequencies," Congress had intentionally restricted this jurisdictional grant to preclude wide-ranging FCC "receiver design regulation." *Id.* at 695, 696.

The All Channel Receiver Act's limited and explicit grant of authority to the Commission over receiver equipment clearly indicates that neither Congress nor the Commission assumed that the agency could find this authority in its ancillary jurisdiction. It also confirms the Commission's absence of authority to regulate receiver apparatus as proposed by the broadcast flag regulations in the *Flag Order*. If the Commission had no ancillary jurisdiction to regulate the quality of UHF reception, it cannot be doubted that the agency has no ancillary authority to regulate consumer electronic devices that can be used for receipt of wire or radio communication when those devices are not engaged in the process of radio or wire transmission.

A second congressional enactment that confirms the limited scope of the agency's ancillary jurisdiction is the Communications Amendments Act of 1982, Pub. L. No. 97-259, § 108, 96 Stat. 1087, 1091-92. As part of the Communications Amendments Act of 1982, Congress authorized the Commission to impose performance standards on household consumer electronics to ensure that they can withstand radio interference. *See* 47 U.S.C. § 302a(a). The legislative history of 47 U.S.C. § 302a demonstrates that this enactment was intended by Congress to give the Commission authority it did not previously possess over receiver equipment. Specifically, the Conference Report stated that, because industry attempts to solve the interference problem voluntarily had not always been successful, "the Conferees believe that Commission authority to impose appropriate regulations on home electronic equipment and systems is *now* necessary to insure that consumers' home electronic equipment and systems will not be subject to malfunction due to [radio frequency interference]." H.R. CONF. REP. NO. 97-765, at 32 (1982) (emphasis added).

The Commission argues that the legislative history of § 302a indicates that the legislation's purpose was to preclude state and local regulation of radio interference. However, it is not until several paragraphs after the portion of the Conference Report quoted above that the Report noted that the legislation was "*further* intended to clarify the reservation of exclusive jurisdiction to the Federal Communications Commission over matters involving [radio frequency interference]." *Id.* at 33 (emphasis added). Congress's principal purpose in enacting 47 U.S.C. § 302a was clearly to expand the Commission's authority beyond the scope of its then-existing jurisdiction, which is inconsistent with the FCC's current view that it always has had sweeping jurisdiction over receiver apparatus under Title I of the Communications Act.

### III. Conclusion

The FCC argues that the Commission has "discretion" to exercise "broad authority" over equipment used in connection with radio and wire transmissions, "when the need arises, even if it has not previously regulated in a particular area." FCC Br. at 17. This is an extraordinary proposition. "The [Commission's] position in this case amounts to the bare suggestion that it possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area. We categorically reject that suggestion. Agencies owe their capacity to act to the delegation of authority" from Congress. *See Ry. Labor Executives' Ass'n*, 29 F.3d at 670. The FCC, like other federal agencies, "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In this case, all relevant materials concerning the FCC's jurisdiction – including the words of the Communications Act of 1934, its legislative history, subsequent legislation, relevant case law, and Commission practice – confirm that the FCC has no authority to regulate consumer electronic devices that can be used for receipt of wire or radio communication when those devices are not engaged in the process of radio or wire transmission.

Because the Commission exceeded the scope of its delegated authority, we grant the petition for review, and reverse and vacate the *Flag Order* insofar as it requires demodulator products manufactured on or after July 1, 2005 to recognize and give effect to the broadcast flag.

*So ordered.*